151 N.J. Super. 209 (1977)
376 A.2d 955
FRANCES KATTERMANN, PLAINTIFF-APPELLANT,
v.
SALVATORE DI PIAZZA AND ANTONINA DI PIAZZA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1977.
Decided June 30, 1977.
*211 Before Judges BISCHOFF, MORGAN and KING.
Mr. Peter J. McDonald argued the cause for appellant (Messrs. Ronca & McDonald, attorneys).
No brief was filed on behalf of the respondents.
The opinion of the court was delivered by BISCHOFF, J.A.D.
Plaintiff Frances Kattermann appeals from an order denying her visitation rights with her son, who was adopted by her parents. The appeal is unopposed and the facts are undisputed.
Plaintiff is the natural mother of John DiPiazza, who was born out of wedlock on September 27, 1961. Plaintiff continued to live with her parents, Salvator DiPiazza (age 76) and Antonina DiPiazza (age 68), defendants herein. When the infant was approximately two years of age plaintiff, then 20 years old, consented to his adoption by her parents. In June 1964 plaintiff married and left her parental home. For the periods September 1964 through September 1965 and September 1966 through September 1967, plaintiff had full care and custody of John while both defendants were working. John, now 15 years of age, has known for years that plaintiff is his natural mother and has, in the past, continually enjoyed visitation with her at the home of his adoptive parents. However, defendants have refused to permit John to visit plaintiff's home, except for the two occasions mentioned above. On several recent occasions John has run away from home and sought to live with his natural mother. This caused defendants to charge him in Juvenile and Domestic Relations Court with being incorrigible; the complaints doing so, however, were dismissed. *212 Defendants have indicated that if John continues to run away they will continue to file complaints against him in the Juvenile and Domestic Relations Court. Defendants have since refused all visitation between plaintiff and John.
This proceeding was instituted by the filing of a verified complaint and order to show cause in which plaintiff sought a judgment "granting reasonable visitation rights including the right to take the infant John from the home of defendants at reasonable times." Defendants did not answer the complaint and did not appear on the return date of the order to show cause, and plaintiff submitted the matter for decision on the moving papers. The trial judge ordered the Division of Youth and Family Services to investigate the family background of the DiPiazzas and their adopted son, John, and also ordered an investigation into the family background of plaintiff. After receipt of those reports, the judge entered an order denying plaintiff the relief sought, stating the reasons for doing so as follows:
The legal basis for the court's conclusion was that the legislature expressed a clear statement of public policy when it adopted N.J.S. 9:3-17c. The purpose of the statute was to protect an adopted child from interference by his natural parents after he had been established in his adoptive home and to protect the adopting parents from later disturbance of their relationship with the child by the natural parents.
Plaintiff appeals from the order denying her visitation rights contending: (1) she is entitled to a plenary hearing on the merits of her petition, and (2) she is entitled to visitation with her biological son.
We approach the resolution of this appeal with full recognition of the firmly entrenched principle of law that "in matters involving custody and visitation the ultimate concern of our courts is always for the welfare of the infant. This is the controlling element." Mimkon v. Ford, 66 N.J. 426, 430 (1975); see also, concurring opinion of Justice Sullivan at 439.
*213 N.J.S.A. 9:3-17, upon which the trial judge relied, provides in pertinent part:
This act shall be administered so as to give effect to the public policy of this State to provide for the welfare of children requiring placement for adoption and so as to promote policies and procedures which are socially necessary and desirable for the protection of such children, their natural parents and their adopting parents. To that end, it is necessary and desirable

* * * * * * * *
(c) to protect the adopting parents from assuming responsibility for a child without sufficient knowledge of the child's heredity and capacity for physical and mental development, and, having accepted a child for adoption, from later disturbance of their relationships to the child by the natural parents.
That statute is primarily concerned with adoption by persons other than relatives of children placed for adoption because parents are unwilling or unable to care for them. Mimkon v. Ford, supra 66 N.J. at 434. In re Adoption of Children by D., 61 N.J. 89, 92 (1972). This case is outside the zone of primary concern of the Legislature in enacting N.J.S.A. 9:3-17 et seq. Cf. Mimkon v. Ford, supra 66 N.J. at 435.
Here, until recently, the adoptive parents neither needed nor wanted protection from the natural mother. They permitted the child and the natural mother to develop a close relationship over the years. A consideration of the reports of the Division of Youth and Family Services indicates a strong desire on the part of this 15-year-old child to have visitation with his natural mother, and such desire has probative value in the resolution of this dispute. Cf. Sheehan v. Sheehan, 38 N.J. Super. 120 (App. Div. 1955).
We are thus confronted with a situation involving a serious potential for emotional and psychological harm to this child should he be presented with a court order holding that his natural mother has no right to visit him at the home of his adoptive parents, and should his adoptive parents continue to deny him the right to visit his natural mother at her home. When such a potential for harm exists, *214 a hearing to determine "the best interests of the child" is required. Sorentino v. Family & Children's Society, 72 N.J. 127, 132 (1976).[1]
The idea expressed in the dissent, that visitation by the child with his natural mother contrary to the wishes and orders of the adoptive parents is to be anticipated and should not be punished by proceedings in the Juvenile Court, we find unacceptable. The Juvenile Court cannot condone the refusal of a child to follow parental orders if such defiance constitutes incorrigibility.
Considering the highly unusual circumstances existing here, we hold that it was improper to interpose the prohibition of N.J.S.A. 9:3-17(c) to deny the child access to the love and affection of his natural mother in the absence of a determination that it is in the best interests of the child to do so. A determination of that issue can only be made following a plenary hearing.
We reverse the order denying plaintiff visitation rights and remand the matter to the trial court for the conduct of a plenary hearing to determine the best interests of the child with respect to a resumption of visitation with his natural mother.
Reversed and remanded.
MORGAN, J.A.D. (dissenting).
Although in sympathy with the court's intentions in this unique matter, I must dissent because I fail to perceive an adequate legal basis for the court's intrusion into what is essentially a private family dispute.
*215 By her consent to her parents' adoption of her child, plantiff lost her parental rights when the adoption became final. The adoptive parents succeeded to the rights she relinquished and have for years assumed full responsibility for the supervision and rearing of the boy. Nothing in the record even suggests that they have been remiss in any legally cognizable manner in the discharge of these responsibilities. The boy has not been abused or neglected. If anything, he has been loved too much.
The substance of the controversy presented us is really a dispute between parents, their child and a third party over the child's permitted associations. The parents take the view that they don't want the boy to visit with this third party, in this case his natural mother. That, in my view, and despite its apparent irrationality and lack of compassion for the boy's and the natural mother's emotional needs, is their right. The decision as to whom their child should be permitted to associate with is theirs and theirs alone, and should not be reviewable by a court even in the well-intentioned quest for the best interests of the child.
A court's jurisdiction over a parent-child relationship is sharply circumscribed. Where a parent is found to have been abusive or neglectful of a child to the extent that the child's safety or health is threatened, then a court may intervene in exercise of its parens patriae jurisdiction. To permit a court to review the correctness of parental decisions concerning the persons with whom their child may associate would intrude the courts to an intolerable degree into the most intimate aspect of such parent-child relationship.
At issue in Mimkon v. Ford, 66 N.J. 426 (1975), was the right of a maternal grandparent to visitation with her granddaughter who had been adopted by a second wife of the child's father. Her right of visitation was sustained on the basis of a statute, N.J.S.A. 9:2-7, which, as construed *216 by the court, specifically authorized the granting of such privileges. No similar statute provides this court with jurisdiction to order visitation by the natural mother following an adoption by another, and over the objections of the adoptive parents, in contravention of the policy described in N.J.S.A. 9:3-17(c). Indeed, in Mimkon the court foresaw the difficulties inherent in enforcing visitation by a natural mother against the will of those who adopted her child:
Furthermore, it is a natural grandparent rather than a natural parent who is seeking visitation here. Interference by a natural parent with the relationship between the child and the adopting parents introduces alternative and conflicting authority figures in the child's life, creating tremendous emotional tension in the child and ultimately threatening to undermine the authority of the adoptive parents and their ability to make parental decisions. [at 435-436]
Such possibilities threaten in this case, apart from the jurisdictional question with which I am primarily concerned. The boy clearly cares for his natural mother and wants to visit her. No one can fail to sympathize with his desires. Nonetheless, his parents say no, and this court by its judgment is threatening to overrule that parental decision and hence undermine their parental authority. Whatever the merits of the application in moral terms, I cannot agree that we should grant the requested relief.
If the court intrudes itself into this matter, it would be difficult to remain aloof in other equally sympathetic applications where we, unlike the adoptive parents, perceive benefit to the child. The fundamental question really posed is who shall make the decision as to where a child's best interests lie  the parents or the court. My colleagues say, in substance, that the parent should decide unless they are clearly wrong. My dissent is based upon the proposition that the parents decide, right or wrong, in the absence of any suggestion *217 that they are unfit or that the health or safety of the child is threatened thereby.[1]
At least one authority has directly focused on this issue:
But when the parents are legally fit, who is to say that a nonparental guardian or a juvenile court judge is better able to interpret the child's interests than are the child's parents? It is precisely that question that has made most students of the subject argue strongly in favor of retaining support for the protection of natural family ties, because experience has shown that to do so is a better alternative for the children involved, even though the children themselves are not yet in a position to appreciate fully why that may be so. [Hafen, "Reservation About Children's Rights," 1976 B.Y.L. Rev. 605, 649]
My real concern is with the boy's relationship to the juvenile authorities. The record suggests that he has been deemed a runaway and incorrigible for defying his parents in seeing his natural mother. Research has unearthed no authority suggesting recognition of a juvenile's right of association. Nevertheless, I feel constrained to remark that a juvenile's insistence upon seeing his natural mother, where she has not been deemed a poor influence, should not brand him an incorrigible. My focus here is not on the natural mother's right to see her child; she lost those rights when the judgment of adoption became final. Rather, I am concerned with *218 the consequences to the boy in the event he insists upon visiting with his mother.
Whether or not the boy's insistence on seeing his natural mother renders him an incorrigible or a runaway is a matter best left to the initial determination of the juvenile authorities after consideration of the circumstantial context of such conduct. The juvenile's age, the length of the visitation, the distance travelled by the juvenile, the natural mother's fitness, are all circumstances to be considered. For example, a visit by a 17-year-old juvenile with his mother in the same or even adjacent community would be quite different from a visit by a 10-year-old across the country. Each case would have to be determined on its own facts. In the final analysis, we must leave the matter to the good sense of the juvenile authorities in not unnecessarily blighting a young man's future with a juvenile record for the entirely human desire for the companionship of his natural mother, or in placing him in an institution when there are so many who care for him so much.
I would affirm.
NOTES
[1] While these proceedings have been instituted by the natural mother who, by consenting to the adoption, has surrendered all rights to the child, N.J.S.A. 9:3-30; N.J.S.A. 9:3-19.1, we have approached the issue as if the proceedings were instituted by or on behalf of the child. We recognize that the responsibility of the court as parens patriae of all minor children transcends all other considerations when there exists a potential for serious psychological harm to a child. Sorentino v. Family & Children's Society, supra 72 N.J. at 132.
[1] Sorentino v. Family & Children's Society, 72 N.J. 127 (1976), does not hold otherwise, and has only tangential relevance to the present matter; it neither supports nor undermines the court's opinion. The fact, however, that the court in Sorentino consented to determine an issue of custody as between foster parents and the natural mother points up the dangers inherent in the court's opinion in this case. Here it is the natural mother who desires visitation. In the next case, it well might be foster parents who, after years of custody and the formation of a sound relationship with the juvenile, desire to continue that association through court enforced visitation. Who is to say whether or not the juvenile's mental health would be best served by permitting such visitation? Are such questions to be answered by the adoptive parents or by a court? The majority contends that the court makes the final determination. It is with respect to this proposition that issue is joined.