154 N.J. Super. 513 (1977)
381 A.2d 1232
IN THE MATTER OF THE ADOPTION OF ONE CHILD BY R.A.C. AND G.D.C.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1977.
Decided December 5, 1977.
*514 Before Judges CONFORD, MICHELS and PRESSLER.
Mr. Robert A. Abrams argued the cause for objector-appellant A.D. (Messrs. Patterson & Abrams, attorneys).
Mr. Francis J. Campbell argued the cause for plaintiffs-respondents R.A.C. and G.D.C. (Messrs. Campbell & Sachs, attorneys).
The opinion of the court was delivered by CONFORD, P.J.A.D.
This is an appeal by the mother of a child from a judgment granting the complaint of plaintiffs R.A.C. and his wife G.D.C. for adoption of the child and terminating all relationships between the child and her natural parents. The judgment was based upon a finding of *515 fact by the trial judge, after a thorough hearing, in which the opposing parties were represented by counsel, that the natural mother had forsaken parental duties and relinquished parental claims. The natural father, who was not married to the mother, did not appear in the proceedings and does not appeal.
The child here involved, K., was born February 4, 1976 to appellant A.D., 31 years of age at the time of the hearing. A.D. had been divorced several years previously, with three young children the product of the prior marriage. When A.D. found herself pregnant with this child she asked the natural father whether he would assist in maintaining it. He refused and urged her either to abort it or surrender it for adoption. At the time, A.D. was having difficulty with her divorced husband over support payments due from him for the children and his demand for custody of the children because of her pregnancy. In these circumstances A.D. was convinced she could not afford to keep the child. She became interested in a suggestion by her employment supervisor that a young couple known to him (plaintiffs herein) would be interested in adopting her child. Telephone contact was arranged between A.D. and plaintiffs, and A.D. gradually developed the conviction that it would be in the best interests of the unborn child that it be given up to plaintiffs for adoption. She so assured the plaintiffs well before the birth of the child.
In December 1975, at plaintiffs' request, A.D. conferred with Donald Campbell, plaintiffs' attorney. He took pains to assure her that he could not be an intermediary in the adoption but was only advising the Cs legally, yet he advised A.D. that she could change her mind. Moreover, he acted as plaintiffs' agent in defraying all of A.D.'s medical and hospital expenses in connection with the birth of the child, and he had extended discussions with her as to these and related matters.
On February 7, 1976 A.D. and the newborn child were discharged from the hospital, and A.D. the same day turned *516 the child over to the wife of her employment supervisor and to the mother of Mrs. C., the prospective adopting parent. The evidence indicates that while A.D. was perturbed about the decision she was making, she was nevertheless satisfied that since she would be unable to take care of the child it was in its best interests to surrender it. Further, by then she felt "committed to the Cs."
Mr. Campbell had A.D. and the natural father come to his office on the evening of March 7, 1976 to sign consents to the adoption by the Cs. It is undisputed that, at A.D.'s insistence, the group all went to the Cs' home that same evening so that A.D. might satisfy herself as to the welfare of the child in the adoptive home, and that A.D. expressed satisfaction with what she observed. There is sharp disagreement, however, as to whether, as A.D. testified, Mr. Campbell insisted on her signing the consent before he would allow her to go to the Cs' home. The latter testified this was untrue, and he said the visit was made prior to the signing of the consents. The trial judge noted this conflict in his written opinion but did not resolve it. There is agreement that A.D. required the deletion from the consent form of a waiver of notice of hearings on the adoption before she would sign it.
On May 24, 1976 Carol Andrews, a case worker with the Division of Youth and Family Services, visited A.D. in her home in the course of her investigation and reported to the court on the adoption. A.D. told her she had been mentally vacillating over whether to repudiate the adoption, but she did not say she had yet changed her mind about it. She appeared to Miss Andrews to have given considerable thought to the problem and to the significance of adoption. It may be noted that A.D. holds an associate in arts degree from a community college and that her testimony demonstrates intelligence and articulateness in expression.
A.D. did not communicate her doubts about the adoption to plaintiffs until early June 1976. Mrs. C. testified that A.D. sent word about that time that she wanted to talk *517 with the Cs. They met, A.D. said she felt "terrible and guilty" about her altered feelings, but she did not at that time request return of the child. The Cs were first apprised of A.D.'s contest of the adoption on July 29, 1976, the day before the first hearing date.
Plaintiffs called one expert, a psychologist who had met with the Cs and the child when she was eight months old, between two of the hearing dates. He testified basically that the child was well adjusted, and that she had developed a significant relationship with the Cs. Disruption would have an immediate and lasting adverse effect upon her. He explained that the "crucial imprint period," during which significant relationships are developed, is from around 6 to 18 months, and removal of the child during that period would be especially devastating.
Cf. Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127 (1976).
We conclude that the judgment should be affirmed. In so doing we need not resolve the factual dispute mentioned above concerning the circumstances of the execution of the consent by A.D. Even if she signed the consent unwillingly, and only in order to be allowed to inspect the Cs' home, the critical issue remains whether the totality of her conduct in relation to the turning over of the child to the Cs constitutes a forsaking of parental obligations. In a private placement situation, as here, a written consent, even if voluntary, could not of itself bind a surrendering parent irrevocably. Sees v. Baber, 74 N.J. 201, 215 (1977). The consent here could have only limited probative weight on the ultimate issue of relinquishment or abandonment of the child, as the credible evidence is that A.D. was told by Mr. Campbell that the signing of the consent was only a first step in the proceedings.
The determination by the trial judge of a statutory forsaking of parental obligations by A.D., see N.J.S.A. 9:3-24 C; Sees v. Baber, supra, 74 N.J. at 210, is supported by adequate credible evidence on the whole record. The decision *518 by A.D. had not been a hurried or spur-of-the-moment matter. The prospects of providing a satisfactory home for this child in the adverse circumstances confronting A.D. shortly before and as of the time of delivery of the child were dim. Her conscious and deliberate decision  one by a mature, intelligent and experienced woman  was that it was in the best interests of the child that it begin life in a different household. When the child was physically turned over to the Cs on February 7, 1976, there began, to A.D.'s knowledge, an emotional investment in this child by the Cs which would grow by leaps and bounds each passing week and month. In In re Adoption of a Child by R.D., 127 N.J. Super. 311 (App. Div. 1974), certif. den. 65 N.J. 292 (1974), in comparable circumstances, we said:
* * * although K. was unhappy about her decision at the time she acted on it and over the considerations which motivated her to make it, the decision was nevertheless deliberate, long under consideration, and with clear knowledge of its probable consequences. In such circumstances we are satisfied that the statutory factor of protection of the adopting parents "from later disturbance of their relationships to the child by the natural parents", N.J.S.A. 9:3-17(c), ought to have weighty effect. [127 N.J. Super. at 314]
In the overall balance of the interests of all involved, the child, the natural parents, the prospective adopting parents and society as a whole, we are confident that net justice in the case militates strongly for the conclusion that there has been a statutory forsaking by A.D. The four to five-month period it took A.D. to renounce the objectively critical action of physically surrendering the child to the Cs constitutes the determinative factor in this fact complex. Sees v. Baber, supra, is readily distinguishable in the circumstance that the surrendering mother there recanted and demanded her child back within two days. 74 N.J. at 207-208, 216. A return of the child at that time would have entailed no prospect of injury to the child and minimal emotional investment by the prospective adopters. The quick change of mind substantially diluted the element of abandonment and relinquishment. Id at 216.
*519 Notwithstanding the foregoing conclusions, we must underscore the monitions of the Supreme Court in Sees against private arrangements for surrender of infants for adoption. 74 N.J. at 217-220. Mr. Campbell's activity in this matter, however well-intentioned in his case, should not be repeated by the bar.[1] Counsel representing prospective adopters in private placement situations would be well-advised not to have any direct contact whatever with the surrendering parent.
Judgment affirmed; no costs.
NOTES
[1] Mr. Campbell tried a good part of this case, but then suffered the embarrassment of having to withdraw as counsel because he was an essential witness for plaintiffs.