641 A.2d 235

IN THE MATTER OF THE ADOPTION
OF A CHILD BY D.M.H. AND S.H.

Argued November 8, 1993—Decided April 28, 1994.

474

*Iraisa Orihuela–Reilly* argued the cause for appellant, J.H. (*J. Paul Mohair,* Director, Cape–Atlantic Legal Services, attorney).

*Barry J. Beran* argued the cause for respondents D.M.H. and S.H. (*Beran & Beran,* attorneys).

*Nancy Goldhill* argued the cause for *amicus curiae,* Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The controversy in this case is between a mother, who voluntarily surrendered her newborn baby for adoption but subsequently objected to the adoption, and the adoptive parents, who seek to terminate the mother's parental rights so that they can adopt the child.

The surrender of the child for adoption took place privately. The parties agreed that the biological mother could have some continuing contact with the child following his adoption. Almost a year after the surrender of the child, the adoptive parents brought this action for adoption. At that time, the biological mother objected and filed a complaint for custody.

The trial court found that the biological mother had intentionally abandoned her child, but the court refused to terminate her parental rights because it had a reasonable expectation that she would reverse her conduct constituting abandonment. The court therefore dismissed the adoption complaint, although it ordered

custody of the child to remain with the would-be adoptive parents, subject to visitation by the biological mother.

On appeal, the Appellate Division determined that the biological mother had intentionally abandoned her child and that the abandonment was not subject to reversal, but was final. It therefore terminated the mother's parental rights and ordered that the adoption be granted. On the basis of a dissent, which found that the biological mother had not intentionally abandoned the child, the mother appealed to this Court as a matter of right. *R.* 2:2-1(a)(2).

The central issue on appeal is whether under the private-adoption statute the parental rights of the biological mother should be terminated on grounds of intentional abandonment. A related issue is whether under the statute the intentional abandonment of a child is subject to reversal. This case also raises the issue of whether an adoption may be subject to an agreement that allows the biological parent to maintain a relationship with the child.

I

Jeanne H. (also sometimes referred to as "J.H.") became pregnant in the fall of 1989. She was then twenty-years-old, unmarried, and the mother of an infant boy, Bobby. J.H. apparently had misgivings about having or keeping the baby, or both. She had considered abortion in November 1989. In January 1990, she first began to think about giving up the baby for adoption.

Donna and Steve H. (also sometimes referred to as "Hs") wanted to adopt a baby when, after two years of marriage, they realized that they could not have one of their own. Donna H. has two teenage daughters from her previous marriage. She began inquiring at the pediatrician's office where she was employed whether the patients knew of any expectant parents who might be interested in giving up their baby for adoption. Through a mutual acquaintance Donna H. first contacted Jeanne H. in February 1990. The Hs initiated discussions with Jeanne H. about the

possibility of adopting her unborn child. The discussions continued throughout the period of J.H.'s pregnancy. Eventually, Donna H. took J.H. to the hospital clinic for prenatal visits.

Jeanne H. apparently reached a decision in the spring of 1990 to give up her child for adoption. Around May 1990, she called an attorney about representing her in the adoption. According to J.H., she decided to give up the child for adoption only on June 29, 1990. The trial court found that J.H. had made the decision to have the Hs adopt her child "late in the pregnancy, possibly as late as June of 1990." J.H. stated that she had had "enough time to think about giving up [her] child to the Hs in July of 1990" and that hers had not been a "snap decision."

The parties agreed that Jeanne H. would receive pictures of the child and would be able to visit him. J.H. stated that she was going to be able to visit the baby at least "twice a month" and believed that she would be "a big part of the baby's life" as a "nannie" or "Aunt Jeannie" to the child. Donna H. stated: "We had agreed that when the baby was a certain age ... he would get to meet his brother and any other children that she had had later on in years." (Since this litigation began, Jeanne H. had another child, who currently lives with her and her other son Bobby, and is engaged to be married). The trial court found that the parties had agreed that J.H. "could visit with the child and be informed as to the child's progress."

On July 22, 1990, J.H. delivered a healthy baby boy. A few days later, on July 27, 1990, she surrendered the child to the Hs, who named the child Steven. On October 15, 1990, J.H. signed a consent form for the adoption. The trial court found that J.H. had knowingly and voluntarily signed the document with legal counsel present and that she knew "the nature of the consent form document which she was signing."

During the first year of the child's life, J.H. called the Hs approximately once a month to obtain photos of the child and to inquire about the child's development. J.H. testified that she had called the Hs in September, October, November, and December of

1990. At another point, however, J.H. stated that she had asked to see the child "every other week" since the surrender of her child. The parties also had dinner in January 1991.

The Hs filed their complaint for the adoption of Steven on May 28, 1991. Shortly thereafter, on July 16, the parties argued about whether J.H. could see the child to give him his birthday present. After repeated conversations between Donna H. and J.H., Steve H. spoke on the phone with J.H. She said: "Well I'm going to—I want to come and get my baby." Steve H., in anger and frustration, responded: "Well, then come and get the baby." On the same day, July 16, Jeanne H. sent a letter to the Atlantic County Surrogate's office objecting to the adoption. On July 21, 1991, the day before the child's first birthday, the parties met and J.H. saw Steven for the first time since she had surrendered the child. At that time, as found by the trial court, Jeanne H. "made a decision to attempt to regain custody of the child." On the following day, July 22, J.H. filed a complaint for custody. That complaint alleged that the Hs had "requested that she [J.H.] take the child back."

J.H. stated that at one point she had wanted "her child back" starting about four months after the surrender. Her friend testified that J.H. had wanted the child back "[a]fter she came home from the hospital." J.H. further explained that she "didn't want to let them [the Hs] know that I wanted him back, because I knew if I said anything like that, I would not be able to see my son at all." At the same time, J.H. said that she did not go forward with a request for the child's return because she wanted "to keep my end of the deal." J.H. also claimed that she thought she had up to one year to change her mind, seemingly basing that assumption on a conversation with her attorney. Therefore, she thought she would be able to reclaim the child and take the child back "permanently."

The trial court found that Jeanne H. had never communicated to the Hs her decision to regain custody of the child until she filed her custody complaint. Before July 1991, according to the court,

phone conversations only involved updates on the child's development, not his return. "There was never a request for [the child's] return until July of 1991."

The trial court determined that J.H. had intentionally abandoned her child. However, the court ruled that the private-adoption statute, *N.J.S.A.* 9:3–48(c)(1), provides for the reversal of conduct demonstrating intentional abandonment, and the court determined that it had "a reasonable expectation of reversal" of the conduct constituting intentional abandonment. Accordingly, the court ruled that termination of J.H.'s parental rights was impermissible and denied the Hs' complaint seeking adoption, but awarded the Hs custody of Steven and granted visitation rights to J.H.

The majority in the Appellate Division interpreted the statute not to permit the reversal of conduct constituting intentional abandonment. According to the majority, the intentional abandonment of the child by J.H. was final, and that court ordered the termination of her parental rights and authorized the adoption by the Hs, without any rights of visitation for J.H.

The dissent disagreed with the majority's determination of an intentional abandonment as well as with its interpretation of the statute, which would foreclose a reversal of conduct constituting abandonment. Therefore it would have denied the termination of parental rights.

## II

All inquiries that bear on whether parental rights may be terminated must be considered in light of the extraordinarily strong protections that surround those rights. The right of a biological parent to enjoy a relationship with his or her child is fundamental and constitutionally protected. *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 631 *A.*2d 928 (1993). As this Court stated in *New Jersey Division of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 512 *A.*2d 438 (1986):

[W]e emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights'. . . ." The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected.

[*Id.* at 599, 512 *A*.2d 438 (quoting *Stanley, supra,* 405 *U.S.* at 651, 92 *S.Ct.* at 1212, 31 *L.Ed.*2d at 558).]

Accordingly, strict standards must be satisfied before a parent's rights will be terminated. *Santosky v. Kramer,* 455 *U.S.* 745, 762–64, 102 *S.Ct.* 1388, 1399–1400, 71 *L.Ed.*2d 599, 612–13 (1982); *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992).

### A.

The private-adoption statute controlling this litigation provides that to terminate a biological parent's rights, a court must find "intentional abandonment or a very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future." *N.J.S.A.* 9:3–48(c)(1). Alternatively, a court may terminate parental rights if the parent "has substantially failed to perform the regular and expected parental functions of care and support of the child, which shall include maintenance of an emotional relationship with the child." *N.J.S.A.* 9:3–46(a).

■ "Abandonment" in both private and public adoptions requires a state of mind that indicates the willful or purposeful repudiation of parental responsibilities. *L.A.S., supra,* 134 *N.J.* at 134–35, 631 *A.*2d 928 (noting that despite differences in public- and private-adoption statutes regarding termination of parental rights, substantive standards are "roughly equivalent"); *In re Baby M.,* 109 *N.J.* 396, 444–45, 537 *A.*2d 1227 (1988) (same). "Abandonment requires a finding that a parent has willfully foresaken obligations, although physically and financially able to discharge those obligations." *L.A.S., supra,* 134 *N.J.* at 134, 631 *A.*2d 928; *accord In re Guardianship of K.L.F.,* 129 *N.J.* 32, 39, 608 *A.*2d 1327 (1992); *J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312. The biological parent "must have engaged in a course of conduct that 'evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child.'" *L.A.S., supra,* 134 *N.J.* at 135, 631

A.2d 928 (quoting *In re N.*, 96 *N.J.Super.* 415, 426, 233 *A.2d* 188 (App.Div.1967)).

█ A court's determination of abandonment is fact-oriented. Our case law establishes that surrender and consent are factors that bear on abandonment. *See, e.g., Sees v. Baber*, 74 *N.J.* 201, 377 *A.2d* 628 (1977); James B. Boskey, *Adoption, The Termination of Parental Rights and Baby M.*, 18 *Seton Hall L.Rev.* 866, 869, 873 n. 44 (1988) (noting that private surrender may be some evidence to be considered by court in terminating parental rights). Further,

> [w]hether the consent, or its attempted withdrawal, should be given any weight in determining if the adoption should be allowed, would depend on a variety of circumstances, such as the conditions under which the consent was originally given, the length of time between the giving and the withdrawal of the consent, the extent of reliance on the consent by the potential adoptive parents, and the development of the child while in their custody.
>
> [*In re Adoption by B.*, 63 *N.J.Super.* 98, 103, 164 *A.2d* 65 (App.Div.1960).]

The court must also consider whether the biological parent communicated the decision to withdraw consent to the potential adoptive parents, and whether prompt and diligent actions to secure the return of the child in order to exercise parental rights over the child followed the withdrawal of consent. *Sees, supra*, 74 *N.J.* at 214, 377 *A.2d* 628; *In re Adoption of One Child by R.A.C.*, 154 *N.J.Super.* 513, 516, 381 *A.2d* 1232 (App.Div.1977), *certif. denied*, 75 *N.J.* 607, 384 *A.2d* 837 (1978); *In re Adoption of a Child by P. and Wife*, 114 *N.J.Super.* 584, 591–92, 277 *A.2d* 566 (App.Div. 1971).

█ The deliberative, informed, and voluntary nature of the decision to surrender the child and to consent to the child's adoption tends to demonstrate intentional abandonment. *R.A.C., supra*, 154 *N.J.Super.* at 518, 381 *A.2d* 1232 (noting that biological mother did not surrender child for adoption on "spur-of-the-moment"); *In re Adoption of a Child by R.D.*, 127 *N.J.Super.* 311, 319, 317 *A.2d* 382 (App.Div.) (observing that biological parent had decided to put child up for adoption more than six months before child's birth), *certif. denied*, 65 *N.J.* 292, 321 *A.2d* 253 (1974).

Surrender and consent, however, are not dispositive of an intent to repudiate parental obligations. *Baby M., supra,* 109 *N.J.* at 433–34, 445, 537 *A.*2d 1227. A surrender and consent to adoption can be overcome by the biological parent's "change of mind." *Sees, supra,* 74 *N.J.* at 208, 377 *A.*2d 628. Such a change of mind must ordinarily occur within a reasonable period of time after the surrender of the child for adoption. *Compare id.* at 211–12, 377 *A.*2d 628 (emphasizing that biological mother sought to regain custody of her child only two days after surrender) *with R.D., supra,* 127 *N.J.Super.* at 319, 317 *A.*2d 382 (terminating parental rights where biological parent raised no objection to adoption for at least six months until adoptive parents had begun formal adoption proceedings), and *R.A.C., supra,* 154 *N.J.Super.* at 513, 381 *A.*2d 1232 (noting that "the four to five-month period it took [biological mother] to renounce the objectively critical action of physically surrendering the child to the [adoptive parents] constitutes the determinative factor"). Moreover, a change of mind usually must be accompanied and followed by actions intended to regain parental rights over the child. *See, e.g., Baby M., supra,* 109 *N.J.* at 445, 537 *A.*2d 1227 (noting that court will not find intentional abandonment "where the natural parents, having surrendered their child for adoption through private placement, change their minds and seek the return of their child"); *Sees, supra,* 74 *N.J.* at 216, 377 *A.*2d 628 (finding surrender and consent to adoption overcome by "immediate change of mind and prompt, diligent attempts to regain the child" by biological parent).

 The trial court found that Jeanne H. had intentionally abandoned her child. It determined that J.H.'s surrender and consent were deliberative and informed. She "spent sufficient and substantial time thinking about ... giving up the child for adoption" and "had the opportunity for counseling, even if she chose not to avail herself of that opportunity." J.H. "knew what she was doing at the time ... the surrender was made." It was not a "snap decision." *See, e.g., R.A.C., supra,* 154 *N.J.Super.* at 518, 381 *A.*2d 1232. Additionally, three months after the surrender of

the child, on October 15, 1990, J.H. knowingly and voluntarily signed an adoption consent form, with the advice of counsel.

Furthermore, the surrender and consent were voluntary. Although J.H. seemed to claim at some points that she was under financial strain and that her family had exerted some pressure against her keeping and raising the child, the record includes no evidence that J.H. was "financially and physically" unable to discharge her parental responsibilities. *See A.W., supra,* 103 *N.J.* at 616, 512 *A.*2d 438. The trial court, moreover, found that the kind of "stress" that J.H. had experienced did not interfere with her ability to make a voluntary decision to surrender her baby for adoption.

The trial court also did not find that the surrender and consent were negated by a change of mind. Even the dissent in the Appellate Division believed that J.H. merely had had "second thoughts" about her decision to surrender the child for adoption. However, she had not actually experienced a "change of mind" immediately or even shortly following the decision either to surrender the child or to consent to his adoption. *See Sees, supra,* 74 *N.J.* at 201, 377 *A.*2d 628; *R.A.C., supra,* 154 *N.J.Super.* at 516, 381 *A.*2d 1232. Further, J.H. took no "prompt, diligent steps to regain the child." *See Sees, supra,* 74 *N.J.* at 216, 377 *A.*2d 628. As the trial court found, Jeanne H. did not "attempt to exercise any parental function" and "never [made] a request for [the child's] return until July of 1991."

Moreover, the Hs relied on the decision of the biological mother to surrender and consent to the adoption of the child. *See B., supra,* 63 *N.J.Super.* at 103, 164 *A.*2d 65. J.H. never confronted the Hs with a challenge to their rights to adopt the child until she had decided to contest the adoption complaint. *Cf. Baby M., supra,* 109 *N.J.* at 446–47, 537 *A.*2d 1227 (observing that when adoptive parents "[know] almost from the very day that they [take the baby] that their rights [are] being challenged by the natural mother," who sedulously seeks to regain child, she will be deemed to have "retained her rights as a mother"); *Sees, supra,* 74 *N.J.* at

216, 377 A.2d 628 (noting that claims of adoptive parents were almost immediately challenged by biological mother, who took "prompt, diligent steps to regain the child"). Further, the child, as found by the trial court, had "completely bonded with the Hs," and thus found the Hs to be "his parents."

The dissent believed that Jeanne H. had expressed interest in the child but "[m]ost" of those expressions of interest had been "rebuffed" by the Hs, who "wanted to prevent opportunities for affectionate contact." Nevertheless, J.H. did not wish to regain custody of her child so that she might assume "the regular and expected parental functions of care and support for [the] child," see A.W., supra, 103 N.J. at 616, 512 A.2d 438, or become the child's "parent." Cf. L. 1993, c. 345, § 9 (providing that regular and expected parental functions include "maintenance of a relationship with the child such that the child perceives the person as his parent"). Rather, J.H. wished only to be "a part" of the child's life. Thus, J.H.'s wishes did not present any challenge to the claims of the Hs as adoptive parents.

The record fully supports the determination of the intentional abandonment of the child. The evidence convincingly demonstrates that Jeanne H's decision to give up the child for adoption was voluntary, uncoerced, deliberate, and informed. Moreover, within a reasonable time J.H. did not change her mind or take any effective action to regain the child to assume full parental responsibilities. Finally, the adoptive parents reasonably and fully relied on the biological mother's decision to surrender and consent to the adoption of the child.

### B.

The further issue is whether an intentional abandonment can be reversed. N.J.S.A. 9:3–48(c)(1), to reiterate, provides that a termination of parental rights can be based on "intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future."

The Court, in *In re Adoption of D.*, 61 *N.J.* 89, 293 *A.*2d 171 (1972), considered a prior private-adoption statute, *N.J.S.A.* 9:3–18(d), *repealed by L.* 1977, *c.* 367, § 20. The Court examined the provision authorizing the termination of parental rights based on a repudiation of or failure to perform parental responsibilities. It construed this statute "to require a past course of conduct amounting to intended abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future." *Id.* at 94–95, 293 *A.*2d 171.

We conclude that the Legislature intended the text of *N.J.S.A.* 9:3–48(c)(1) to adopt the Court's interpretation of the prior private-adoption statute. That view has generally been shared by courts that have considered the question. The adoption statute "codified the requirement that there must be, in addition to past intentional abandonment or substantial neglect, an absence of a reasonable expectation of a reversal of that conduct in the future." *In re Adoption of Two Children by J.J.P.*, 175 *N.J.Super.* 420, 427, 419 *A.*2d 1135 (App.Div.1980); *see, e.g., K.L.F., supra,* 129 *N.J.* at 39, 608 *A.*2d 1327; *Baby M., supra,* 109 *N.J.* at 427, 537 *A.*2d 1227; *Sees, supra,* 74 *N.J.* at 210–13, 377 *A.*2d 628.

The majority of the Appellate Division, however, rejected the view that conduct constituting intentional abandonment may be subject to a finding of a reasonable expectation of reversal: "[A]bandonment is abandonment, and one either has abandoned a child or has not. There are no degrees of abandonment." It observed further: "Abandonment is a terminal act not subject to reasonable expectation of reversal."

Although in some cases abandonment may reflect a clear and definitive decision to repudiate parental responsibilities, and perhaps may be viewed as a "terminal act," abandonment also may be, and indeed often is, based on a course of conduct that from time to time may reflect uncertainty or ambivalence. Thus, as with conduct suggesting only substantial neglect of parental responsibilities, conduct that demonstrates intentional abandonment

may change over time. Hence, we perceive no reason to impute to the Legislature an intent to foreclose a parent whose course of conduct gives rise to the intentional abandonment of parental rights and obligations, as opposed to the substantial neglect of parental duties, from demonstrating within a reasonable time that such conduct has changed or is likely to change. *Accord L.* 1993, c. 345, § 11 (amending adoption statute, specifically *N.J.S.A.* 9:3–48(c)(1), to provide for termination of parental rights if "substantial failure to perform" or "inability to perform" "regular and expected parental functions of care and support of a child" is "unlikely to change in the immediate future").

■ The Appellate Division majority also emphasized that the language of the termination provision reflects a legislative determination to modify the Court's opinion in *D., supra,* 61 *N.J.* at 89, 293 *A.2d* 171, because the Legislature "purposefully omitted a comma between the 'neglect' portion and the 'reversal of that conduct' part of the statutory language." We are not persuaded, however, that the Legislature deleted the comma to impart a different meaning to the standard for termination of parental rights from that expounded in *D.* We can think of no sound reason to limit the possibility of reversal of conduct only to behavior evincing neglect but not to conduct constituting intentional abandonment of parental duties. Thus, under the private-adoption statute, an intentional abandonment that is itself largely predicated on a course of conduct may be overcome if within a reasonable time a reasonable expectation exists that such conduct will be reversed in the future.

■ The trial court, as well as the dissent on appeal, determined that notwithstanding intentional abandonment on the part of Jeanne H., a reasonable expectation existed of reversal of that conduct constituting intentional abandonment, and that termination of J.H.'s parental rights was therefore not permissible.

According to the trial court, the facts that justified the determination of reversal were that J.H. "is prepared to support her child monetarily, to the extent possible on her income; to provide input

and guidance; and to communicate that through contact and through love." The dissent also noted J.H.'s "affirmative expressions of continued interest in the child," and believed that "the trial judge responded to those factors by concluding that there was a reasonable expectation of reversal."

We conclude that the record does not support a finding that the biological mother engaged in action giving rise to a reasonable expectation of the reversal of the conduct that demonstrates intentional abandonment. Because intentional abandonment involves the willful repudiation of parental obligations, a reversal of abandonment must, minimally, involve conduct that is tantamount to the purposeful resumption of parental obligations.

Parental obligations encompass the performance of the regular and expected functions of care and support of the child. *See L.A.S., supra*, 134 *N.J.* at 134, 631 *A.*2d 928; *A.W., supra*, 103 *N.J.* at 616, 512 *A.*2d 438; *see also L.* 1993, *c.* 345, § 11 (continuing to recognize that "substantial failure to perform the regular and expected parental functions of care and support of the child, although able to do so," may warrant termination of parental rights).

Jeanne H. did not engage in conduct sufficient to demonstrate a reasonable expectation that she would perform the regular and expected parental functions of care and support. Following her surrender of the child for adoption, her actions failed to overcome the conduct that amounted to the intentional repudiation of her parental obligations. As noted, J.H. never sought to have the child regard her as "his parent." See *L.* 1993, *c.* 345, § 9. At no time did she express the wish to undertake the normal parental responsibilities for the child; she wanted simply to be a "big part" of his life and to be a sort of "nannie" or "aunt" to the child. Her interest was only in seeing the child and in being informed of his progress. Even in contesting the adoption, although she professed to seek "custody," J.H. clearly sought essentially visitation rights. Therefore, Jeanne H. was not confronted with Solomon's

test, *post* at 496, 641 *A*.2d at 246, because while she loves her biological child, she did not seek to assume parental responsibility for him.

Equally important, J.H. did not within a reasonable time demonstrate any conduct that would suffice to counteract her intentional abandonment of the child. The trial court believed that a reasonable expectation of a reversal of conduct could be demonstrated at any time between the physical surrender of the child and the preliminary adoption hearing. We disagree with that analysis.

The Hs did not file their adoption complaint until ten months after that surrender. *N.J.S.A.* 9:3–48(a)(4) provides for not less than a two-month nor more than a three-month waiting period after an adoption complaint has been filed before a preliminary hearing may be scheduled. Thus, the court held the preliminary hearing more than a year after Steven had been surrendered. *N.J.S.A.* 9:3–48(c)(4) also provides for not less than a six-month nor more than a nine-month waiting period between that preliminary hearing at which parental rights are terminated and the final hearing at which adoption is ordered. Under the trial court's analysis, the earliest time adoptive parents in private adoptions could seek to attain permanent custody would be eight months from the time of surrender, and therefore that would be the latest time within which the biological mother could endeavor to demonstrate the expectation of a reversal of her intentional abandonment of the child.

We conclude that the appropriate period within which a biological parent may demonstrate a reversal of the conduct constituting intentional abandonment is a reasonable time commencing from the time of the surrender of the child for adoption. What constitutes a reasonable time must be determined in the light of all of the surrounding circumstances. *R.A.C.*, *supra*, 154 *N.J.Super.* at 513, 381 *A*.2d 1232; *R.D.*, *supra*, 127 *N.J.Super.* at 319, 317 *A*.2d 382.

We acknowledge that adoptive parents should be encouraged to file adoption complaints as early as possible. *See N.J.S.A.* 9:3–44 (providing that private adoptive parents institute actions with "reasonable promptness," but failure to so act "shall not be a sole basis for refusal of the adoption"); *cf. L.* 1993, *c.* 345, § 7 (deleting "reasonable promptness" language of adoption law and providing that private adoption complaint be filed within forty-five days after child to be adopted is brought into home). Nevertheless, whether or not an action is brought promptly by adoptive parents, the biological parent must within a reasonable time engage in a course of action that demonstrates a reasonable expectation that the conduct constituting the intentional abandonment of the child has been or will be reversed. That did not occur in this case.

### C.

We conclude that the biological mother, Jeanne H., intentionally abandoned her child Steven in surrendering him for adoption and in consenting to his adoption by the Hs, and thereafter in failing immediately, promptly, or within a reasonable time to withdraw or negate that surrender and consent or to take any action sufficient to provide a reasonable expectation that she would reverse the conduct constituting intentional abandonment. Further, the adoptive parents fully and reasonably relied on the actions of the biological mother in intentionally abandoning the child for the purpose of his adoption.

### III

■■■ J.H. argues further that the decision to surrender the child for adoption was subject to a mutual agreement that she would be able to maintain certain contacts with the child and that that agreement was not fulfilled by the Hs.

The trial court found that the parties had agreed that Jeanne H. "could visit with the child and be informed as to the child's progress." The court, however, believed that such an agreement had "absolutely no legal effect."

We conclude that this conditional agreement does not give the mother legally-enforceable rights to rescind the decision to surrender the newborn child for adoption because our private- and public-agency adoption statutes do not provide for post-adoption rights, including visitation, on the part of biological parents. The statute governing this case provides, in pertinent part:

> a. The entry of a judgment of adoption shall terminate all relationships between the adopted child and his parents and all rights, duties and obligations of any person that are founded upon such relationships, including rights of inheritance under the intestate laws of this State, except such rights as may have vested prior to entry of the judgment of adoption; provided, however, that when the plaintiff is a stepfather or stepmother of the adopted child and the adoption is consummated with the consent and approval of the mother or father, respectively, such adoption shall not affect or terminate any relationship between the child and such mother or father or any rights, duties or obligations based thereupon.
>
> [*N.J.S.A.* 9:3–50(a).]

The court has defined the primary purpose of that provision "to protect adoptive parents from post-adoption disruptions in their relationship with adopted children, by natural parents who have surrendered children for adoption or where parental rights have been judicially severed." *In re Adoption of Children by F.*, 170 *N.J.Super.* 419, 422–23, 406 *A.*2d 986 (Ch.Div.1979); *see C. v. R.*, 169 *N.J.Super.* 168, 404 *A.*2d 366 (Ch.Div.1979); *Mimkon v. Ford*, 66 *N.J.* 426, 332 *A.*2d 199 (1975). The new statute maintains the policy that adoption ends the parental role of the biological parents and transfers that role to the adoptive parents. *L.* 1993, *c.* 345, § 13(b).

Most courts, including those in New Jersey, tend not to recognize a birth parent's right to visit a child once a final adoption order has been entered to "strangers," that is non-relative, adoptive parents. *See* Carol Amadio & Stuart L. Deutsch, *Open Adoption: Allowing Adopted Children to "Stay in Touch" with Blood Relatives*, 22 *J.Fam.L.* 59, 60 (1983–84); *see also* B. Lee Phillips, Note, *Open Adoption: A New Look at Adoption Practice and Policy in Texas*, 43 *Baylor L.Rev.* 407, 409 (noting that open-adoption policy of Texas is not "legally sanctioned process"). *See generally* Danny R. Veilleux, Annotation, *Postadoption Visitation*

*by Natural Parents,* 78 *A.L.R.* 4th 219 (1990 & Supp.1993) (reviewing post-adoption visitation cases).

A few New Jersey courts have considered post-adoption visitation in adoption agreements between a biological parent and another biological parent, step-parent, or grandparent. *See, e.g., Kattermann v. DiPiazza,* 151 *N.J.Super.* 209, 376 *A.*2d 955 (App. Div.1977) (holding that post-adoption visitation of child who was adopted by grandparents on basis of biological parent's unconditional consent was required to promote child's best interests); *F., supra,* 170 *N.J.Super.* at 425, 406 *A.*2d 986 (ruling that post-adoption visitation rights to biological father, where stepfather was allowed to adopt children on biological father's condition to continued visitation to promote best interests of child, but noting that "it may be unprecedented in New Jersey for an order of visitation to be specifically incorporated within a judgment of adoption by a stepparent"); *cf. In re Guardianship of R.O.M.C.,* 243 *N.J.Super.* 631, 581 *A.*2d 113 (App.Div.1990) (holding that public-agency adoption termination of mentally-ill biological parent's rights that mandated visitation between biological parent and child inappropriate because applicable termination statutes "spoke in absolute terms"; noting, however, that continued contact between biological parent and child possible on voluntary basis without court order).

The argument proffered by the biological mother may implicate the issue of whether the parties in this case contemplated a so-called "open adoption." "An open adoption occurs when, prior to the adoption, it is agreed in writing that the child will have continuing contact with one or more members of his or her biological family after adoption is completed." Amadio & Deutsch, *supra,* 22 *J.Fam.L.* at 61–62; *cf.* Laurie A. Ames, Note, *Open Adoptions: Truth and Consequences,* 16 *Law & Psychology Rev.* 137, 137 (1992) (stating that "[a]n open adoption occurs when the adopted child and one or more members of the biological family maintain contact after adoption has occurred"). The type of contact provided for in open adoptions ranges from visits to

telephone calls to the provision of photographs. Joseph R. Carrieri, "The Legal Handbook of the Foster Care System," *Criminal Law and Urban Problems*, at 7 (PLI Litig. & Admin.Practice Course Handbook Series No. 163, 1992).

"Open adoptions" engender sensitive and complex considerations of public policy. Amadio & Deutsch, *supra*, 22 *J.Fam.L.* at 66; Judy E. Nathan, Note, *Visitation After Adoption: In the Best Interests of the Child*, 59 *N.Y.U.L.Rev.* 633 (1984); Sandra Gardner, *Beyond Records: Open Adoption*, N.Y. Times, June 20, 1992 (N.J. Weekly), at 17. Courts have differed with respect to the clarity and strength of public policy on the issue of "open adoptions" under their respective statutory schemes. *Compare In re Gregory B.*, 74 *N.Y.*2d 77, 544 *N.Y.S.*2d 535, 542 *N.E.*2d 1052 (recognizing that post-adoption visitation limited to when adoptive parents are grandparents, siblings, or foster parents), *reh'g denied sub nom. In re Willie John B.*, 74 *N.Y.*2d 880, 547 *N.Y.S.*2d 841, 547 *N.E.*2d 96 (N.Y.1989) *with Michaud v. Wawruck*, 209 *Conn.* 407, 551 *A.*2d 738, 740–42 (1988) (stating that as long as "best interests of the child" is framework, "public policy does not forbid an agreement about visitation rights between a genetic parent and adoptive parents").

The adoption statute governing this case does not expressly contemplate an agreement between biological and adoptive parents to permit a continuing relationship between the former and the child. Moreover, the recent revision of the adoption statute rejected a proposed open-adoption provision, *L.*1993, *c.* 345, § 13(d), which would have provided that:

> With the consent of the adopting parent the court may provide in the adoption order for visitation or other type of communication with the child after the adoption by any person who had a relationship with or was biologically related to the adopted child. This provision may be modified by the court, subsequent to the adoption on petition of the adoptive parent for good cause shown.

*See* Toby Solomon & James B. Boskey, *Adoption Reforms Are Signed Into Law*, 3 *N.J.Law* 55, 77 (Jan. 10, 1994) (reporting that Legislature explicitly rejected open-adoption provision that provided for "a visitation schedule or other type of communication

between the birth parent and the adopted child"). As the Senate Statement notes:

> [T]he amendments delete language which would have allowed a court to provide, in an adoption order, a visitation schedule or other type of communication between the birth parent and the adopted child. While it is not the intent of the committee in deleting this language to discourage open adoptions, it was felt that the issue of open adoption represents a significant policy issue which should be addressed in separate legislation.
>
> [Senate Judiciary Committee, *Statement to Senate, No. 685* (1993).]

Notwithstanding the absence of legislation, voluntary and informal open-adoption arrangements do exist and, for some families, such arrangements may balance the needs of biological and adoptive parents. *See* Phillips, *supra*, 43 *Baylor L.Rev.* at 409 (noting that open adoptions in Texas are popular, despite not being "legally sanctioned"). Because the Hs have withdrawn their consent to visitation by the birth mother, we need not and do not address or resolve the validity of a voluntary and consensual open-adoption arrangements.

The trial court, in denying the adoption, authorized the Hs to maintain physical custody of the child. It reasoned that the child had been in the Hs' continuous custody, at the time of trial, for "his entire life." The court also found "that this child is completely bonded with the Hs ... [and] that he sees them as his parents." Therefore, the court concluded "that [the Hs] ... are, in fact, his parents."

Nevertheless, the trial court authorized continued visitation for J.H., not because it believed the agreement for post-adoption contact by J.H. to be in the best interests of the child or independently enforceable, but because the court determined that it could not terminate J.H.'s parental rights. In *Baby M., supra*, 109 *N.J.* at 463–68, 537 *A.*2d 1227, the Court authorized a similar disposition. However, in this case, unlike in *Baby M.*, visitation rights cannot be predicated on the parental rights of the biological mother in light of our determination that J.H.'s parental rights must be terminated.

Further, no other grounds justify continued visitation with the child by the biological mother. As noted, the agreement itself cannot, under the circumstances, constitute a basis for the award of such visitation to J.H. The agreement was intended only to enable J.H. to be a part of her child's life. Nothing in the record and the trial court's findings suggests that the child's best interests might require a continuing relationship with his biological mother. *Cf. J.C., supra,* 129 *N.J.* at 26, 608 *A.*2d 1312 (recognizing that public-agency adoptions may exist in which "the welfare of children ... reasonably requires continued contact with natural parents subsequent to guardianship being granted to DYFS"). The trial court determined, as already noted, that the child had fully bonded to his adoptive parents and "that Miss H is to [the child] ... for all practical purposes a complete stranger."

## IV

The judgment of the Appellate Division is affirmed and visitation pending appeal is terminated.

O'HERN, J., concurring in part and dissenting in part.

I agree with the majority that a parent who has voluntarily surrendered a child to another for private-placement adoption is not foreclosed before the judgment of adoption from demonstrating that he or she has not forsaken parental obligations. That is the holding of *In re Baby M,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988). Except in the case of approved-agency adoptions, a consent to surrender custody of a child is always revocable.

"[I]n an unsupervised private placement, since there is no statutory obligation to consent, there can be no legal barrier to its retraction." The only possible relevance of consent in these matters, we noted, was that it *might* bear on whether there had been an abandonment of the child, or a forsaking of parental obligations. Otherwise, consent in a private placement adoption is not only revocable but, when revoked early enough, irrelevant.

[*Id.* at 433–34, 537 *A.*2d 1227 (quoting *Sees v. Baber,* 74 *N.J.* 201, 215, 377 *A.*2d 628 (1977)) (citations omitted).]

Because of that, the only basis on which a termination of parental rights may be premised is the familiar four-part standard set forth in *In re Guardianship of J.C.*, 129 *N.J.* 1, 608 *A.*2d 1312 (1992).

> The first finding is that the child's health and development have been or will be seriously impaired by the parental relationship. Secondly, the court must conclude that the parents are unable or unwilling to eliminate the harm and that a delay in permanent placement will add to the harm. Third, the court should be convinced that alternatives to terminating parental rights have been thoroughly explored and exhausted, including sufficient efforts made to help the parents cure the problems that led to the placement. Fourth, all of those considerations must inform the determination that termination of parental rights will not do more harm than good.
>
> [*Id.* at 9, 608 *A.*2d 1312 (citations omitted).]

That is because although "[t]he statutory descriptions of the conditions required to terminate parental rights differ[,] their interpretation in case law, however, tends to equate them." *Baby M, supra,* 109 *N.J.* at 444, 537 *A.*2d 1227.

In this case, as in *Baby M,* "the trial court never found [the birth mother] an unfit mother * * *." *Id.* at 445, 537 *A.*2d 1227. I must, therefore, disagree with the majority that grounds for termination of the birth mother's parental rights have been demonstrated. All that we have is a confused and hesitant young woman confronted by the eternal riddle posed by Solomon's test: which of the two, a birth mother or an adopting parent, most loves this child?

Recognizing her own weaknesses, Jeanne, the birth mother, was willing to yield custody of her child to Donna and Steve, the adopting parents, but did not want to give up all contact with her child. Her rights to her child should be decided now on a level playing field. She did not know the rules that governed her conduct when she met with Donna and Steve. How could she possibly have understood the complexities of open adoption outlined by the majority in its opinion or that we would hold that it is not an option for her? But an open adoption is what she wanted and what may turn out. In a private-placement adoption, a mother who wishes to remain in contact with her child cannot

realistically be shut out of the child's life. Some day, somehow, they may or will be reunited.

Jeanne was a twenty-year-old single parent of a two-year-old child when she conceived her second child. She received public assistance. Jeanne had only a ninth-grade education. She was living in the home of her father and step-mother. Her parents gave her no emotional support. In fact, her father told her that she would have to move out if she kept the baby. Jeanne thought of an abortion, but she chose life for her child and in January 1990 began to consider adoption as a means of providing for the welfare of her unborn child.

In February 1990, through a friend of Jeanne, Donna communicated with Jeanne about the possible adoption of her child. Jeanne, Donna, and Steve discussed the adoption. Donna convinced Jeanne that her baby would have a better life in her home. Jeanne agreed to give Donna and Steve her baby for adoption provided that she would still have contact with the baby, that the baby would know her as next-of-kin, and that the baby would know his older brother.

On July 27, 1990, five days after delivering her son, Jeanne surrendered her newborn to Donna and Steve for a private adoption. On October 15, 1990, with the advice of counsel, Jeanne signed a consent form for that adoption. Jeanne understood she would have six months to a year after surrendering the child to regain custody. She was correct.

> Where a surrender [of a child] is given to one other than an approved agency, the effectiveness of the surrender is even more open to question. There is no statutory authority for honoring such a surrender, and the language of the adoption statute makes it quite clear that such surrender has no *per se* legal effect. The surrender may serve as some evidence of the intent of a parent to surrender his or her parental rights, so that a child may be adopted, or of the failure of the parent to meet the standards for objecting to an adoption, but it does not, in and of itself, provide a basis for the termination of parental rights. The court must, in the course of the preliminary hearing in an adoption action, confirm the failure of the parents to meet the standards for objecting to the adoption or determine that the parents have lost their rights to the child under the standards set forth in the statute.

[James B. Boskey, *Adoption, The Termination Of Parental Rights And Baby M,* 18 *Seton Hall L.Rev.* 866, 869–70 (1988) (footnotes omitted).]

Certainly, the idea of an "abandonment" of Jeanne's child on the basis of her surrender is "open to question."

As the trial court found and the majority states, "The parties agreed that Jeanne H. would receive pictures of the child and would be able to visit him." *Ante* at 478, 641 *A.*2d at 237. Jeanne believed that even though she had no physical custody of her baby, she would still be "a big part of the baby's life," and was not totally abandoning her child. Jeanne testified that after surrendering the child, she made numerous telephone calls to Donna and Steve requesting pictures of the child and permission to see him. Donna denies receiving such requests but states she provided pictures and a videotape of the child to Jeanne.

During the months after surrendering her child and before Donna and Steve filed their complaint for adoption, Jeanne had second thoughts about giving up her child, and wanted her child back. Jeanne never told this to Donna and Steve because she wanted "to keep [her] end of the deal." In early 1991, however, she communicated with the attorney who advised her when she first considered allowing Donna and Steve to adopt her child. She requested the attorney's assistance to revoke her consent to the adoption and gain custody of her child, but the attorney refused to continue representation. She communicated with other attorneys; however, she had no money with which to hire a lawyer. On learning that she might be eligible to obtain the assistance of Legal Services, she immediately communicated with that office.

Within months of the complaint for adoption, Jeanne sent a letter to the Atlantic County Surrogate objecting to the adoption. Through the assistance of Legal Services, Jeanne filed a complaint for custody on July 22, 1991. Subsequently, she filed a motion for visitation.

Jeanne had always tried to maintain communication with her child. She continuously talked with Donna and Steve by telephone concerning the health, welfare, and development of the

child. She had dinner with Donna and Steve in January 1991. As the majority notes, Jeanne stated that she asked to see the child "every other week" from the time of surrendering her child. However, not until the day before the child's first birthday did Donna and Steve permit Jeanne to see her son.

Although Jeanne surrendered physical custody of her child, she never "abandoned" him and had not "forsaken [her] parental obligations" when she placed her child in a home with people whom she believed performed "the natural and regular obligations of care and support of [her] child." *N.J.S.A.* 9:2–13(d). Nothing in this record indicates that Jeanne seriously impaired or will seriously impair her child's health and development. Is she to be condemned because she sought, without full knowledge of the law, to provide a better place for her child to grow up? This record contains no evidence of harm to the child from exposure to his mother Jeanne. In short, no basis exists to terminate Jeanne's parental rights under the *J.C.* standards, except for the possible harm due to psychological bonding.

Because this child has lived with Donna and Steve for his entire life of four years, he might suffer irreparable injury if taken from them. If that be so and the court makes such a finding, then the law will have been fulfilled. But that finding cannot be made on this record. Jeanne must be given a chance to present her case on the issue of whether bonding with Donna and Steve is so strong that it could be broken now. I would remand the matter to the trial court for a hearing pursuant to *Sorentino v. Family & Children's Society of Elizabeth,* 72 *N.J.* 127, 367 *A.*2d 1168 (1976), to determine if a "probability of serious harm to the child" would occur if the baby were reunited with his birth mother. *Id.* at 133, 367 *A.*2d 1168.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Concurring in part; dissenting in part*—Justice O'HERN—1.