821 A.2d 1190 (2002)
360 N.J. Super. 191
The COURIER POST, Plaintiff
v.
LENAPE REGIONAL HIGH SCHOOL DISTRICT, Defendant.
Superior Court of New Jersey, Law Division, Burlington County.
Decided October 28, 2002.
*1191 Thomas J. Cafferty, Somerset, for Plaintiff (McGimpsey and Cafferty, attorneys).
John J. Pierano, Newark, for Defendant (Carpenter, Bennett & Morrissey, attorneys).
SWEENEY, A.J.S.C.
This is a case of first impression. However, it is the second action brought by the Courier Post (Courier Post or Post) against the Lenape Regional High School District (Lenape) to compel production of attorneys' itemized bills for inspection and, when specifically requested, for copies of such bills. This action, instituted by Order to Show Cause, is brought pursuant to the Open Public Records Act (OPRA or the Act), N.J.S.A. 47:1A-1, et seq. The former action was instituted pursuant to the Right to Know Law (RTKL), N.J.S.A. 47:1A-2.
On July 8, 2002, the effective date of OPRA, Lenape received a request from the Post "to inspect the invoices and itemized attorney bills submitted by four law firms from 1996 through June 30, 2002. Those four firms are Archer & Greiner; Capehart, Scatchard; Parker, McCay & Criscuolo; and Carpenter, Bennett & Morrissey." The request was made pursuant to OPRA and asked for a response from Lenape within seven (7) days. That same day, Patricia Milich, Lenape's Public Information Director, notified the Post that Lenape had developed a specific form to be used for requests made pursuant to OPRA. On July 9, the Post complied by submitting the requisite form. On July 17, 2002, Ms. Milich responded, informing the Post that the bills of Parker, McCay & Criscuolo and Carpenter, Bennett & Morrissey would be available for inspection on July 19, 2002.[1] The letter also informed the Post that: "We believe your request... clearly imposes an extraordinary burden on the District. Accordingly, ... there will also be a special service fee as *1192 provided for in OPRA." (Emphasis added). Finally, the letter requested a "prepayment amount of $7,500" toward a total cost of $15,000 to $20,000 to be paid "at the time of access." On July 24, 2002, reporters from the Post were granted access to the bills from the Parker and Carpenter firms. On July 30, 2002, the Post submitted a revised request seeking all bills from the Capehart and Archer firms relating only to the Lenape District's Facilities Expansion Project. The following day, Ms. Milich wrote to the Post explaining that certain portions of the bills would require redaction and that the Capehart Firm's estimate for review and redaction was $3,000 to $3,500 and the Archer & Greiner's estimate for similar work was $3,500 to $4,000. A deposit of $3,250 was demanded in order to process the Post's request in anticipation of having the bills "available within 10 to 15 days receipt of" the deposit.
On August 16, 2002, this court executed the Post's Order to Show Cause requiring Lenape to appear and show cause why it should not be ordered to allow access to the attorneys' bills and "limiting costs to the statutory fees for copies requested."
The matter was argued on October 9, 2002. Additional briefing was ordered and completed on October 14, 2002. Counsel were in basic agreement that this matter could proceed in a summary fashion without the need for an expedited plenary hearing regarding issues such as the location of archived documents, difficulties locating and retrieving documents, and compiling documents for inspection and examination by the Post. Rather than conducting a fact-finding hearing, the court was referred to the exhibits accompanying the pleadings and briefs as well as the affidavits of Patricia Milich and Thomas S. Rende, the latter being the Assistant Superintendent/Business Administrator of the Lenape School District. Those affidavits had been filed in the RTKL case.
Mr. Rende, while not referring to any specific documentation supporting his conclusions, states in Paragraphs 21 through 25 of his affidavit of October, 2001:
21. In connection with the September 2001 document inspection resulting from a right-to-know request from the Courier-Post, the tasks of examining the request, identifying the particular paper record sought in the request; searching the District's archived and current files to locate the numerous requested documents; physically retrieving, assembling and organizing the documents; and reviewing the assembled documents to insure that they were accurate and complete, require that a substantial number of work hours of District personnel be diverted from normally tasks. To insure that the work was performed accurately and completely, numerous hours of professional time had to be expended in supervising the clerical work associated with the requests, verifying the correctness of the work and in performing significant portions of the work that prudently could not be delegated to clerical staff.
22. Once the requested documents had been organized and assembled, the inspection of the documents had to be monitored and supervised by District personnel to insure that the integrity of the records was maintained and to respond to the numerous inquiries and the copying requests posed by the Courier-Post personnel who inspected documents.
23. Upon completion of the inspection, the District was left with the additional *1193 tasks of inventorying the records to insure that they remained complete and in tact and reversing the retrieval process to physically re-file the documents in their proper locations.
24. I kept a running tally of the cost to the District of performing the preparatory work for the Courier-Post's 2001 document inspection. Responding to the Courier-Post's document request consumed 106.25 hours of professional and clerical time at a total cost to the District and its taxpayers of $5,299.53, excluding direct photocopying costs,
25. Based upon the District's preliminary review of the Courier-Post's follow-up right-to-know requests after the September 21, document inspection, the District estimates that the application of 208 hours of professional time and four (4) hours of secretarial time would be necessary to satisfy those requests. The calculation was made by using an average rate of $46.84 for professional time and a standard rate of $8.00 per hour for clerical time associated with this project. Excluding direct per page copying costs, the District estimates that the actual cost of this project would be approximately $9,774.00. In part, the extensive professional time included in this estimate is the result of the scope of documents requested and the necessity to review the documents to protect student and employee privacy.
Patricia Milich also signed an affidavit in October, 2001 in which Paragraphs 10 through 12 and 14 are relevant to this proceeding. There, she stated that:
10. ... the District also made available the cover letters, voucher declarations, and invoice summaries submitted to the District by the law firm of Archer & Greiner in connection with the Cherokee and Seneca High School Projects, along with the corresponding purchase orders. The District did not make available for inspection by the Courier-Post the back-up documentation describing the task-by-task services rendered by the individual Archer & Greiner attorneys whose services were charged on the invoices.
11. The documentation made available for inspection covered a period of several years and was so voluminous that four Courier-Post staffers who participated in the document inspection each expended approximately 9.25 hours over three days  for an aggregate total of approximately 37 hours  physically inspecting the above-referenced documents. These inspections occurred on September 5, 6 and 10, 2001.
12. Either myself or my designee had to monitory the entire inspection in order to answer the numerous questions posed by the Courier-Post staffers during the inspection, to have copies of various documents made at the request of the Courier-Post personnel and to insure that the integrity of the documents was maintained. As a result of the extensive amount of time expended in connection with the Courier-Post's document inspection, the performance of my regular duties was interrupted, and I was forced to work long hours to catch up with my work. Similar interruptions occurred in the regular duties of other District employees involved in assisting with document inspection.
* * *
14. During the document inspection by Courier-Post personnel on September 5, the Courier-Post filled out another Document Request Form seeking all audits of the District for 3 years and a specific *1194 purchase order. I worked that evening to collect the documents and made all of them available to the Courier-Post the following day. The audits were in booklet form which had to be taken apart by hand, then copied and reassembled. This took 2 people 2 hours after their normal work day.
With that factual background, I begin my analysis. In doing so, however, it is important to note what is not in issue in this case unlike the first action in which the same documents were sought prior to the Legislative revision of the RTKL. In that action, Lenape contended that attorneys' itemized bills were not records subject to disclosure pursuant to the RTKL. Here, the concessions found in their brief is both short and deliberate:
Significantly, there is no issue in this case concerning whether the requested documents are government records subject to disclosure under the OPRA. The District stands ready to redact and prepare all of the requested for disclosure upon plaintiff's payment of the requested deposit and provide plaintiff with access thereto. (Emphasis added.)
Lenape does contend now, as it did under the RTKL, that it is entitled to a "special service charge" because the Post's request creates an "extraordinary burden" upon the resources of the school district in order for it to produce the documents sought for inspection and examination. The special service fee will include the reimbursement to Lenape of counsel fees incurred to have the law firms review and redact from those bills privileged and other confidential material.
It is clear from a reading of OPRA that redaction of material from public records is legislatively recognized and sanctioned. For example, N.J.S.A. 47:1A-5a states in pertinent part:
Prior to allowing access to any government record, the custodian therefore shall redact from that record any information which discloses the social security number, credit card number, unlisted telephone number, or driver license number of any person; ... (Emphasis added).
So, too, Section 5g provides that: "If the custodian of a government record asserts that part of a particular record is exempt from public access pursuant to P.L.1963, c. 73 (C. 47:1A-1, et seq.) ... the custodian shall delete or excise from a copy of the record that portion which the custodian asserts is exempt from access and shall promptly permit access to the remainder of the record."
The Post concedes the right of redaction of privileged information to Lenape but contends that: (1) its request is not "extraordinary" in the context of OPRA; and (2) that in no event should it be required to pay, by way of reimbursement, counsel fees for the review and redaction of counsel's own bills for services previously rendered to Lenape.
I have already held that pursuant to the RTKL Lenape could not charge a fee for the time and effort required to produce for inspection public records required by law to be kept. I determined that the setting of fees for such expenditures of time and effort was a legislative function and not a decision for the court.
In OPRA, the Legislature has now spoken out on the issue of fees separate and apart from copying expenses, breaking the silence on that issue which existed in the RTKL. The question for the court here is when and under what circumstances an *1195 inspection request results in "an extraordinary expenditure of time and effort to accommodate the request" so that "a public agency may charge ... a special service charge ...?" Moreover, if such a charge is warranted, the question is whether it can include attorneys' fees for redaction of the bills which they previously submitted to the Board of Education for services rendered.
In interpreting a legislative enactment, the Supreme Court recently wrote in Velazquez v. Jiminez, 172 N.J. 240, 798 A.2d 51 (2002):
That the starting point in the language of the Statute itself is clear. " ` the sole function of the courts is to enforce it according to its terms.' " Hubbard, ex rel. Hubbard v. Reed, 168 N.J. 387, 392, 774 A.2d 495 (2001) (quoting Sheeran v. Nationwide Mut. Ins. Co. 80 N.J. 548, 556, 404 A.2d 625 (1979)) (quoting Caminetti v. U.S. 242 U.S. 470, 485, 37 S.Ct. 192, 194 61 L.Ed. 442, 452 (1917)).
All terms in a Statute should be accorded their normal sense and significance. Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138, 156, 773 A.2d 674 (2001). When a Statute is subject to more than one plausible reading, our role is "to effectuate the legislative intent in light of the language used and the objects sought to be achieved." State v. Hoffman, 149 N.J. 564, 568, 695 A.2d 236 (1979) (internal citations omitted).
Primary regard must be given to the fundamental purposes for which the legislation was enacted. " `when all is said and done the matter of statutory construction... will not justly turn on liberalisms, technisms, or the so-called formal rules of interpretation, it will justly turn on the breadth of the objectives of the legislation and the common sense of the situation.' " LaFage v. Jani, 166 N.J. 412, 431, 766 A.2d 1066 (2001) (alteration in original) (quoting Jersey City Chap. [of] Prop. Owner's Protective Ass'n. v. City Council, 55 N.J. 86, 100, 259 A.2d 698 (1969)).
With those general principles in mind, I turn my attention first to the "Legislative findings" expressed in N.J.S.A. 47:1A-1:
The Legislature finds and declares it to be the public policy of this State that: government records shall be readily accessible for inspection copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest, and any limitations on the right of access ... shall be construed in favor of the public's right of access; ..
Next, I focus on the substantive provisions of the Act, concerning accessibility of the records sought by the Post. N.J.S.A. 47:1A-5e provides that "Immediate access ordinarily shall be granted to budgets, bills, vouchers, contracts, including collective negotiations agreements and individual employment contracts, and public employee salary and overtime information." (Emphasis added). Based upon the clear language of this section of the Act, it is readily apparent that the Post is entitled to "immediate access" if, in fact, its request is one which can "ordinarily" be granted. The term "ordinarily" means "normally, usually, generally, as a rule, typically, routinely." Webster's New Collegiate Dictionary.
Whether the Post's request for attorneys' bills was one which could be "ordinarily" granted immediate access or was one which "involves an extraordinary expenditure *1196 of time and effort to accommodate," requires an analysis of several factors, apart from the issue of "redaction" of the records. Those factors include, but are not necessarily limited to: (1) the volume of government records involved; (2) the period of time over which the records were received by the governmental unit; (3) whether some or all of the records sought are archived; (4) the amount of time required for a government employee to locate, retrieve and assemble the documents for inspection or copying; (5) the amount of time, if any, required to be expended by government employees to monitor the inspection or examination; and (6) the amount of time required to return the documents to their original storage place. I hasten to point out that in factor number five, the burden should be placed squarely on the governmental entity to prove that some sort of monitoring is necessary.
Applying these factors to the undisputed facts of this case, I find that the precise volume of records sought is presently incapable of calculation. Some of the records sought, specifically bills from Parker, McCay & Criscuolo and Carpenter, Bennett & Morrissey, were produced by Lenape within two days of Ms. Milich's letter of July 17, 2002. Therefore, I determine that the Post received immediate access to them and that the Post's request for them required no extraordinary expenditure of time and effort. At oral argument, counsel for Lenape argued that the remainder of the bills to be produced "total thousands of pages of documents." The second factor is much more easily applied. The attorneys' bills cover approximately 6 1/2 years and, therefore, are unlikely available so that the Post can have "immediate access." Third, it clearly appears that a substantial number of the documents are archived and require retrieval and assembling before inspection can occur. Fourth, a review of the affidavits filed in the RTKL action suggests that 106.25 hours of professional and clerical time were expended responding to the Courier-Post's document request. Clerical hourly wages of $8.00 and professional hourly wages are $46.84. Fifth, approximately 37 hours of monitoring time was expended over 3 days by Ms. Milich or her designee while Post staffers inspected the documents. However, there was no indication, short of answering some questions, as to why such number of hours was required for monitoring. In order for this amount of time to be included in the computation of a special service charge, there must be justification which does not exist in the record before this court. Finally, Lenape provided no estimates of the time it took to return documents to storage, if in fact, they have been returned.
Section c of the Act provides in pertinent part:
Whenever the nature, format, manner or collation, or volume of a governmental record embodied in the form of printed matter to be inspected, examined, or copied pursuant to this section is such that the record cannot be reproduced by ordinary document copying equipment in ordinary business size or involves an extraordinary expenditure of time and effort to accommodate the request, the public agency may charge, in addition to the actual cost of duplicating the record, a special service charge that shall be reasonable and based upon the actual direct cost of providing the copy or copies;... (Emphasis added).
The above-quoted subsection of the Act is not a model of clarity and is somewhat confusing when read literally. For example, it appears to suggest that the "special *1197 service charge," in addition to the cost of duplicating or copying, is applicable when the public agency must undertake "an extraordinary expenditure of time and effort to accommodate the request" provided that such charge is based upon the direct cost of providing a copy or copies. This implies that copying of documents must be involved. Here, however, the Post is seeking to inspect, not copy, the material, but the Act does not appear to allow special service charge for inspection, only for copying.
In an effort to determine the actual intent of the Legislature regarding the applicability of the "special service charge," I am constrained to look elsewhere for guidance. The parties agree that the above quoted portion of OPRA is remarkably similar to Chapter 119 of Florida's Public Records Act. That Law provides in Section 119.07(1)(b):
If the nature or volume of public records to be inspected, examined or copied ... is such a to require extensive use of information technology resources or extensive clerical or supervisory assistance by personnel of the agency involved, or both, the agency may charge, in addition to the actual cost of duplication a special service charge, which shall be reasonable and shall be based on the cost incurred for such extensive use of information technology resources or the labor cost of the personnel providing the service that is actually incurred by the agency or attributable to the agency for the clerical and supervisory assistance required, or both.
Lenape cites numerous examples of regulations of various Florida administrative agencies which define "extensive" to mean an amount of time from 15 minutes to one hour. See, Fla. Admin. Code Sections: 6C2-2.023(4)(c) (30 minutes); 6C10-1.002(2) (exceeds 20 minutes); 9G-14.010 (computed to nearest quarter of an hour exceeding 15 minutes); 14-1.0081(2) (one hour); 33-102.101 (computed to nearest quarter of an hour exceeding 15 minutes); 36-601.901(5) (computed to nearest quarter of an hour exceeding 15 minutes); 40E-1.125(4) (30 minutes); 49B-1.0131 (computed to nearest quarter of an hour exceeding 15 minutes; and 60AA-1.009(3)) (computed to nearest quarter of an hour exceeding 15 minutes). Moreover, Florida's First District Court of Appeal upheld an agency's definition of "extensive" to mean 15 minutes for the review, copying and refilling of confidential documents. See Florida Institutional Legal Services, Inc. v. Florida Dep't. of Corrections, 579 So.2d 267 (Fla. 1 DCA 1991) rev. den. 592 So.2d 680 (Fla.1991).
In deciding how the "special service charge" should be calculated, Florida's Ninth Circuit Court held in State v. Gudinas, No. CR94-7132 (Fla. 9th Cir. Ct. June 1, 1999) that an agency's charge for providing copies in response to a request which produced a large volume of documents was to be based upon only a clerical rate for time spent making copies even though a person in a higher pay grade actually performed the work due to a staff shortage.
I am satisfied that the request of the Post for 6 1/2 years of attorneys' monthly itemized bills consisting of potentially thousands of pages requires "an extraordinary expenditure of time and effort" on the part of Lenape personnel "to accommodate the request." Without the benefit of agency rules or regulations defining what is meant by "extraordinary" I am not prepared to define with any degree of precision what the term "extraordinary" *1198 means. In the context of the Act, that term is incapable of a one-fits-all definition. There are many variables which require flexibility in the meaning of that term. The size of the agency, the number of employees available to accommodate document requests, the availability of information technology, copying capabilities, the nature, size, and number of documents sought, are but a few variables which can serve to modify the meaning of "extraordinary." Indeed, what may appear to be extraordinary to one school district might be routine to another. Here, the sheer volume of documents and the amount of time (ten to fifteen days) to locate and assemble them renders this request "extraordinary," allowing the imposition of a "special service charge."
Having determined that a special "service charge" is appropriate in the context of this case, it must be determined how that charge is to be calculated. That represents a particularly difficult issue in light of the fact that it appears that some, if not all, of the documents have already been retrieved and assembled for inspection and that others have already been inspected pursuant to my holding in the previous case. Had this issue been presented to this court before retrieval of any of the documents had taken place, I would follow the Florida Rule which I find to be persuasive. I would have directed that retrieval and assembling of the documents be accomplished by not more than two clerical staff members whose hourly rate is $8.00 according to the Milich affidavit and simply multiply that figure by the total hours expended over the 10 to 15 day period. I would then order the School District to show cause why professional or supervisory personnel would be required to expend an "extraordinary" amount of time and effort to supervise, review and/or monitor the inspection of the documents and add such time at the rate of $46.84 per hour, if justified, and arrive at a total to be paid by the Post. However, since retrieval has been, for the most part, already accomplished pursuant to the RTKL request, and since I have previously decided that the RTKL did not allow for such charges to be imposed, I am directing Lenape to provide the court with its estimate of the time required to retrieve the balance of the documents, if any, to complete accommodation of the Post's request in this case, after which I shall review the proposed charges and rule upon their fairness and reasonableness.
I must now turn to the more perplexing issue of "redaction" and decide whether Lenape may include in its "special service charge" reimbursement of counsel fees to be paid to be firms of Archer & Greiner and Capehart & Scatchard for their review and redaction of confidential and privileged information. That charge is projected to be a minimum of $6,500 and a maximum of $8,500, clearly an amount significantly greater than the cost of the clerical and professional time allowed for document retrieval and assembly.
First, I look to the Act itself to determine what provisions our Legislature has enacted concerning redaction of public records. In N.J.S.A. 47:1A-5, there are two subsections dealing with redaction, deletion or excision of information from public records. I have previously cited that portion of subsection a. which mandates redaction of one's social security, unlisted telephone, credit card and driver license numbers. Subsection g. also discusses the same issue when "part of a particular record is exempt from public access." Significantly, both subsections provide for the *1199 "custodian" to redact, excise or delete the exempt information. In the latter subsection, it is stated that "if the custodian of a government record asserts that part of a particular record is exempt from public access ..., the custodian shall delete or excise from a copy of the record that portion which the custodian asserts is exempt from access and shall promptly permit access to the remainder of the record." (Emphasis added). Subsection e., which lists documents ordinarily subject to immediate access, includes bills, but mentions nothing about redaction. The Legislature could have enacted an attorney review clause, but it did not. Neither did it create a special subclass for attorney bills and accord to them any kind of special treatment. It appears rather conclusively that the custodian is responsible for asserting the privilege and making the redaction.
As was previously pointed out, Florida's Public Records Act bears a striking resemblance to New Jersey's OPRA. Section 119.07(2)(a) makes the custodian of records responsible for redaction of exempt material.
A person who has custody of a public record and who asserts that an exemption... applies to a particular public record or part of such record shall delete or excise from the record only that portion of the record with respect to which an exemption has been asserted and validly applies, and such person shall produce the remainder of such record for inspection and examination.
Thus, it appears that our Act, like Florida's, requires that the redaction be done immediately and that access to the records be made available promptly thereafter.
In the Government-in-the-Sunshine Manual produced by the Attorney General of Florida and updated to January 18, 2002, the following question appears:
(1) May an agency charge for the cost to review records for exempt information?
The answer which follows states that:
An agency is not ordinarily authorized to charge for the cost to review records for statutorily exempt material. AGO 84-81. However, the special service charge may be imposed for this work if the volume of records and the number of potential exemptions make review and redaction of the records a time-consuming task. See Florida Institutional Legal Services, Inc. v. Florida Department of Corrections, 579 So.2d at 269. And see, Herskovitz v. Leon County, No. 98-22 (Fla.2d Cir. Ct. June 9, 1998), noting that `it would not be unreasonable in these types of cases [involving many documents and several different exemption] to charge a reasonable special fee for the supervisory personnel necessary to properly review the materials for possible application of exemptions.' (Emphasis added).
Consequently, it is firmly established by both our Act and the Florida Law that review and redaction by the custodian, not counsel, may be made a part of the special service charge. I hold that our Act, like Florida's Open Public Records Act, places the responsibility of identifying exempt material and redacting or excising it squarely on the custodian of the records sought to be inspected. For the time expended for redacting, particularly if the records are voluminous, a special service charge may be made. The attorney general of Alabama issued an opinion answering three questions pertinent to the issues before this court. *1200 See, 251 Ala.Op. Atty. Gen. 38 (June 12, 1998). The attorney general was asked:
May the public entity that is the custodian of that record charge the citizen an attorney's fee for review and evaluation of the requested record to determine whether the record is subject to disclosure?
May the custodian charge the citizen an attorney's fee for review and evaluation of the requested record even when the custodian has access to an attorney who is employed by the public entity to provide legal services, and who is paid for those services with taxes that are collected from the citizens?
May the custodian charge the citizen an attorney's fee for review and evaluation of each and every public record that is requested by the citizen?
The attorney general answered, after providing the legislative findings and declarations in support of the Act, that:
The relatively rare decision to incur legal expenses to determine if an exception applies to a ministerial function, the costs of which should be borne by the public as a whole. Assessing legal fees against a citizen to enable the custodian to decide whether his or her records are public would seriously restrict access to public records.
* * *
Accordingly, it is the opinion of this office ... that a public entity ... may recover the reasonable cost in providing that record to a citizen, including preparation and copying, but not attorney's fees. (Emphasis added).
A case not unlike the one before this court, entitled Trammell v. Martin, 200 Ga.App. 435, 408 S.E.2d 477 (1991), is somewhat instructive. There, plaintiff filed a request under Georgia's Open Records Act asking for "copies of all attorneys fees billed to [the] county by Foster & Foster, P.C. for the fiscal year ending June 30, 1990." The county agreed to comply with the request but indicated that each bill would have to be reviewed by an attorney in the Foster Firm to determine if it contained exempt information and that plaintiff would be charged $90.00 per hour for that service. Since the county attorney, an in-house counsel on the payroll, reviewed the Foster bills, plaintiff was only charged $58.75 for copying expenses, the appellate court sustained the trial court's determination that defendant wrongfully planned to charge plaintiff for outside attorney review time.
OPRA unambiguously imposes the burden of asserting an exemption and causing redactions to be made where applicable on the custodian of those records. The process of review and redaction, however, cannot be used to frustrate the goal of the Act set forth in Section 5g. to "promptly permit access to the remainder of the record." Redaction of privileged or confidential data cannot cause the release of otherwise public information to be placed in a straight jacket. If, for example, the Post appeared at Lenape's office the day following a board meeting at which attorneys' bills had been approved for payment and requested, by submission of the appropriate form, to inspect those bills, should Lenape be able to deny "immediate access" (see N.J.S.A. 47:1A-5e) to the Post on the basis that each attorney must review and redact privileged information which will cost the Post both time and lawyer's fees? I think not. First, that would render an otherwise "ordinary" request one which requires "an extraordinary expenditure of time and effort," not *1201 by the custodian, but by the attorneys whose fees are expected to be paid by the requestor of the documents. Secondly, an individual with sufficient education and experience to hold the position of a custodian of records, should be able to quickly ascertain the presence of, and delete, confidential and privileged information to enable that custodian to "promptly comply with a request to inspect ..." a government record. Third, I fail to understand why it is necessary for confidential or privileged material to appear on an attorney's bill in the first place. I can rationalize no compelling reason for it. If a reason does exist, two areas of concern arise. In the first instance, it is clear that a public agency represented by outside counsel has sufficient control over, and should dictate, how attorney's bills should be prepared and presented. Certainly, this is not a novel issue. Problems relating to redaction have been evident since enactment of the RTKL and, before that, under the common law right-to-know. This is a problem which is not new and which public agencies should have already taken into account. Rules, regulations and protocols should have been adopted years ago which would have eliminated the need for confidential or privileged material to be placed in attorneys' bills. If, indeed, there is some need for confidential or privileged information to accompany bills, it can and should be by way of a separate memorandum or letter which can be easily separated from the bill itself. Furthermore, if attorney's fees were required to be reimbursed to a public agency by virtue of a document request, such attorneys, would, no doubt, be encouraged to include such confidential and privileged material knowing that their billable hours could be required in the future to accommodate every request for review of such bills. Finally, even if the Legislature had contemplated that the redaction process would include attorney review, it did not place those bills into a separate category from other documents in which classified, confidential or privileged materials might be present. Certainly, the Legislature made no provision for a pass-through of attorneys' fees to members of the public who request government documents.
Attorneys' fees will not be allowed to be charged to the Post or to any other requestor of documents for review and redaction of exempt material.
Lenape also asserts that if it is denied the right to recover its actual costs, including counsel fees, OPRA would constitute an unconstitutional unfunded mandate. See N.J. Const., Art. VIIII, Sec. 2, Par. 5 (effective December 7, 1995) and N.J.S.A. 52:13H-1, et seq. (Local Mandates). I am satisfied that this argument lacks merit. The principles enunciated in the Local Mandates Statute are not applicable here. Even though OPRA is a "revision" of the RTKL, there is not, in the words of the Local Mandates Council the "clear potential to increase claimant's funding obligation."
The Post will submit an order consistent with this Opinion.
NOTES
[1] According to Lenape, attorneys' bills are submitted monthly and consist of a cover letter, a voucher declaration and an invoice summary. Each matter billed is identified and contains certification that the work was actually performed without payment of a bonus, a listing of the hours expended by each attorney, the hourly rate of each attorney, the amount billed by each attorney, an aggregate total, a task-by-task description of work performed and a list of all costs and expenses.

At oral argument on October 7, 2002, neither attorney knew whether the bills of these two law firms had been previously retrieved and/or redacted.