990 A.2d 712 (2010)
412 N.J. Super. 357
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
N.J. and D.R., Defendants-Respondents, and
S.W., Defendant.
In the Matter of the Guardianship of D.J., N.D.R., and N.R., Minors-Appellants.
DOCKET NO. A-3598-08T4.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2010.
Decided March 30, 2010.
Randi Mandelbaum, Designated Counsel, argued the cause for minor appellants (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Ms. Mandelbaum, on the brief).
Wilbur Van Houten, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (Paula T. Dow, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Van Houten, on the brief).
Joseph F. Suozzo, First Assistant Child Advocate, argued the cause for amicus curiae Office of the Child Advocate (Mr. Suozzo, attorney; Jo Astrid Glading, Assistant Public Advocate, of counsel; Mr. Suozzo, on the brief).
Kenneth H. Zimmerman argued the cause for amicus curiae Foster Care Alumni of America (Lowenstein Sandler, attorneys; Mr. Zimmerman, of counsel; Mr. Zimmerman, Sally Christie Na, David M. Reiner and Rebecca B. Visvader, on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent D.R. (Dianne *713 Glenn, Designated Counsel, of counsel and on the brief).
Respondent N.J. has not filed a brief.
Before Judges CARCHMAN, PARRILLO and ASHRAFI.
The opinion of the court was delivered by
PARRILLO, J.A.D.
In this parental termination case, the Law Guardian for three children appeals from the Family Part's denial of her request to compel the prospective adoptive parents to continue visitation among the siblings as a function both of the court's parens patriae power and the children's constitutional right to associate with their siblings post-adoption. We affirm.
N.J. is the mother of three children, D.J., born in 1998, N.D.R., born in 1999, and N.R., born in 2001. S.W. is the father of D.J.; D.R. is the father of N.D.R. and N.R. The middle child, N.D.R., was born with cerebral palsy. He is a spastic quadriplegic, had reactive airway disease and suffers "moderate mental retardation."
This family first came to the attention of the Division of Youth and Family Services (DYFS) in January 2000, when N.D.R., then six-months old, sustained second-degree burns from a radiator after being left unattended. Neglect was substantiated against both parents, all three children were removed for a time, but they were later returned to their mother's care.
DYFS had no further contact with the family until August 2005, when D.J., then seven years old, and N.D.R., then four years old, were left alone in the family's apartment. When they were discovered by the police after an anonymous call, N.D.R. was wearing a dirty diaper and had cockroaches crawling on him. Pots on the stove and in the sink had maggots and mold, and there was a plate of insect-infested cat food on the floor. All three children were removed and put into foster care.
On August 25, 2005, DYFS filed a complaint pursuant to N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12 alleging abuse and neglect of the children by all three parents. In February 2006, N.D.R. was placed at Matheny Educational and Medical Center (Matheny), a long-term specialized school and hospital for children and adults with medically complex developmental disabilities. In May 2006, D.J. and N.R. were placed in a foster home with a family friend, T.F.
On October 25, 2007, DYFS filed a guardianship complaint pursuant to N.J.S.A. 30:4C-15 to -20, seeking to terminate the parental rights of the three parents to D.J. and N.R. At a permanency hearing regarding N.D.R., concluding on November 16, 2007, the court agreed with DYFS that select home adoption was an appropriate permanency plan for him. Consequently, on December 16, 2007, DYFS filed an amended guardianship complaint seeking to terminate the parental rights of the parents to all three children.
On September 11, 2008, the mother, N.J., signed a voluntary surrender of her children D.J. and N.R., providing that they be adopted by T.F. The father of D.J., S.W., was never located, and default was entered against him on January 20, 2009. On the same date, D.R., the father of N.R., voluntarily surrendered his rights to N.R., conditioned on N.R. being adopted by T.F. Accordingly, the judge terminated the parental rights of N.J. to D.J. and N.R., and D.R. to N.R. in a judgment of guardianship entered on February 2, 2009.[1]
*714 Meanwhile, on November 21, 2008, DYFS advised the court that after consultation with its expert, its permanency goal for N.D.R. had changed from select home adoption to long term specialized care. The Law Guardian opposed the new permanency goal and requested parental rights be terminated. The judge ordered a consolidated permanency hearing and termination of parental rights trial, which was held in December 2008 and January 2009.
N.D.R.'s special needs were addressed at trial. On account of his cerebral palsy and spastic quadriplegia, N.D.R. required assistance with eating and was totally dependent on others for transfers, bathing and toileting. He was able to propel himself in a manual wheelchair, but required supervision to do so safely. N.D.R. had periodic behavioral outbursts where he uncontrollably cried, spit and scratched.
N.D.R.'s development improved at Matheny. In February 2008, his individualized education program noted that N.D.R. was "easy going" and "cooperative." He adapted well to new situations, made progress with speech and emotions and enjoyed participating in activities. A report by a Matheny psychologist around the same time noted that N.D.R.'s "communication and social functioning" were his strongest areas, and he showed some "beginning signs of independence."
In August 2008, at the request of the Law Guardian, psychologist Sean Hiscox performed a psychological evaluation and "adoptability" assessment of N.D.R. Hiscox found N.D.R. to be a "likeable" child whose behavior problems were "manageable." He noted that N.D.R. needed around-the-clock care, would require a wheelchair-accessible home and vehicle and, as he got older, would require two adults to bathe him. To date, DYFS was not able to locate an appropriate adoptive parent in New Jersey, and given that there is no long-term foster care in New Jersey, the choices were to keep N.D.R. at Matheny or to put him on a national adoption registry. According to Hiscox, if N.D.R. were put on the registry and a home was located, he would likely have to move out-of-state.
Nevertheless, Hiscox opined that N.D.R. needed parents who were emotionally invested in his welfare. Hiscox found that there was a strong sibling bond, as N.D.R. reacted positively to his siblings' visits; however, he believed that finding an adoptive family had precedence over the sibling relationship. He concluded:
Despite the positive tie between [N.D.R.] and his siblings, I see this as a much different relationship compared to a relationship with a parent or caregiver, who is providing careincluding self-help careon a day-to-day basis. Such a relationship is not structured around always having fun together, which is the case with [N.D.R.] and his siblings. As a result, if [N.D.R.] was separated from his siblings and they were not able to maintain their current frequency of contactwhich seems to be the most severe consequence in this matterit would surely result in some emotional harm to [N.D.R.]. But, in my opinion, it would be short lived and over time the benefits of having a consistent caregiver would outweigh keeping him in his present placement in order to maintain his current relationship with his siblings, which entails seeing them on an approximately bi-weekly basis for several hours. Also, regardless of where he is placed, their relationship can be maintained at least to some degree, even if he was placed far away, which would further mitigate the harm to [N.D.R.].
*715 Dr. Leslie Trott, a psychologist retained by DYFS, performed a psychological evaluation of N.D.R. and spoke with the staff at Matheny. Trott found that N.D.R. had the cognitive capability of establishing emotional ties with people; yet he believed it was in N.D.R.'s best interest to remain at Matheny and continue his family relationships, as he was comfortable with his siblings and they would advocate on his behalf.
At the conclusion of trial, the Family Part judge found that the permanency plan for N.D.R. should remain as select-home adoption, and he terminated the parental rights of the mother and the father to him. In the February 2, 2009 judgment for guardianship, the judge ordered continued visitation between N.D.R. and his siblings until the siblings were adopted, but held that he did not have the authority to order post-adoption sibling visitation.
Subsequent to the filing of her appeal from the final order denying sibling visitation post-adoption, the Law Guardian moved for the Family Part to stay the finalization of the adoptions of D.J. and N.R. The judge ordered that the "processing of the adoption shall continue, but the matter shall not be sent to the adoption attorney until after a decision by the Appellate Division on the appeal."[2]
The critical importance of the sibling relationship has been recognized by social scientists, our courts, and Legislature. In N.J. Div. of Youth & Family Servs. v. S.S., the Court quoted mental health experts who believe "that the sibling relationship can be `longer lasting and more influential than any other, including those with parents, spouse, or children[,]' and that `[w]hen it is severed, the fallout can last a lifetime.'" 187 N.J. 556, 561, 902 A.2d 215 (2006) (quoting Nat'l Adoption Info. Clearinghouse, The Sibling Bond: Its Importance in Foster Care and Adoptive Placement 1 (1992), http://www.childwelfare.gov/ pubs/f siblin.pdf); see also Ellen Marrus, "Where Have You Been, Fran?" The Right of Siblings to Seek Court Access to Override Parental Denial of Visitation, 66 Tenn L.Rev. 977, 987 (1999).
New Jersey law recognizes the value of nurturing and sustaining sibling relationships. The Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 to -6 (the Act), provides, in relevant part:
A child placed outside his home shall have the following rights, consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development:
. . . .
d. To the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home;
. . . .
f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his sibling upon placement outside his home, including the provision or arrangement for transportation as necessary[.]
[N.J.S.A. 9:6B-4.]
In implementing its responsibilities under the Act, DYFS promulgated administrative regulations "to ensure that each child" placed out-of-home has the opportunity to visit with siblings, so as to reinforce *716 the child's identity and maintain family relationships, among other things. N.J.A.C. 10:122D-1.1(a). Under N.J.A.C. 10:122D-1.4(a) and (d), a written visitation plan must be developed for every child in an out-of-home placement which must include visits with siblings, either with parental visits or separately.
Further, the DYFS II Field Operations Casework Policy and Procedures Manual (DYFS Manual) directs that DYFS make "every effort" to place siblings together and to reunite them, as placing siblings together "is psychologically beneficial to the children and may help their adjustment." Id. at § 1504 (March 25, 2002). When siblings cannot be placed together, a written visitation plan must be developed and include sibling visitation. Id. at § 1107.1 (December 27, 2004). The reason is that "[m]aintaining contact with brothers and sisters supports the child's identity and links him to his past. However, many children in out-of-home placement are not able to be placed with their siblings. In many cases sibling contact helps to maintain an otherwise problematic placement." Id. at § 911 (December 10, 1993). The DYFS manual further provides that resource parents have a "responsibility to encourage the child's relationship with his siblings and other relatives" by initiating and supporting contact, whether through letters, visits, or telephone calls.[3]Ibid.
These requirements, both legal and administrative, have been imposed in the context of pre-adoption foster care only. In the post-adoption setting, however, countervailing considerations come into play, none more important than the natural and fundamental right of a legal parent to the care, custody, management and control of his or her child. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982); Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15, 35 (1972); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944); V.C. v. M.J.B., 163 N.J. 200, 218, 748 A.2d 539, cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000); Watkins v. Nelson, 163 N.J. 235, 245, 748 A.2d 558 (2000). In this regard, the interests at stake here are not the rights of the natural parents whose rights have already been terminated, but rather the rights of the adoptive parents, who step into the shoes of the natural parents. Once a child is adopted, "[t]he child becomes the child of the adoptive parents and part of their extended family." In re the Adoption of Child by W.P. and M.P., 163 N.J. 158, 169, 748 A.2d 515 (2000). "[A]doption ends the parental role of the biological parents and transfers that role to the adoptive parents." In re Adoption of A Child by D.M.H., 135 N.J. 473, 491, 641 A.2d 235, cert. denied, 513 U.S. 967, 115 S.Ct. 433, 130 L.Ed.2d 345 (1994). It is the adoptive parents' rights that may be infringed in the future, and therefore, it is their rights as parents that must be considered.
This right of parental autonomy is so basic that it may only be infringed by a court, in the exercise of its parens patriae authority to protect the child from serious physical or psychological harm, Moriarty v. Bradt, 177 N.J. 84, 113, 827 A.2d 203 (2003) (quoting Watkins, supra, 163 N.J. at 246-47, 748 A.2d 558), cert. denied, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 *717 (2004), and to make decisions in the best interests of the child, In re Grady, 85 N.J. 235, 259, 426 A.2d 467 (1981), in the face of clear and convincing evidence of parental unfitness, abandonment, gross neglect or "exceptional circumstances." V.C., supra, 163 N.J. at 219, 748 A.2d 539; see also Sorentino v. Family & Children's Soc'y of Elizabeth, 72 N.J. 127, 132, 367 A.2d 1168 (1976). For example, courts have exercised their parens patriae power to override the wishes of parents in authorizing a blood transfusion of a minor. See Grady, supra, 85 N.J. at 259-60, 426 A.2d 467; State v. Perricone, 37 N.J. 463, 475, 181 A.2d 751, cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962).
"Exceptional circumstances" have also been found in the context of a custody dispute, where, in the exercise of their inherent authority to protect the best interests of children, and in certain limited circumstances, courts have granted custody rights to a non-relative of a child. See, e.g., V.C., supra, 163 N.J. at 205-06, 227-28, 748 A.2d 539 (observing that a non-biological parent who has willingly, and with the consent of the biological parent, undertaken duties of a parent to a child not related by blood or adoption and has become a psychological parent, "stands in parity with legal the parent," and custody and visitation are decided based on the best-interest of the child standard); Watkins, supra, 163 N.J. at 253, 748 A.2d 558 (holding that a custody dispute between third party and parent first requires application of the parental termination standard or a finding of "exceptional circumstances"); Moriarty, supra, 177 N.J. at 112, 827 A.2d 203 ("Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child.") (internal citations and quotations omitted); Sorentino, supra, 72 N.J. at 132-33, 367 A.2d 1168 (noting that despite fact that natural mother's surrender of child was invalid, because child was thirty-one months old and had known no other parents but the prospective adoptive parents, natural mother's rights could be infringed if serious psychological harm would befall the child upon removal).
In another context, the Court found that the Grandparent Visitation Statute, N.J.S.A. 9:2-7.1, which allows grandparents to seek visitation with their grandchildren in the face of opposition from the children's parents, was an "incursion on a fundamental right (the right to parental autonomy)", was "subject to strict scrutiny and must be narrowly tailored to advance a compelling state interest." Moriarty, supra, 177 N.J. at 114, 827 A.2d 203. The Court explained that exceptional circumstances may only be invoked when there is proof of serious physical or psychological harm to the child, which is "necessary to overcome the presumption in favor of the parent's decision and to justify intrusion into family life." Id. at 113, 827 A.2d 203.
Although the power of the courts to act in the best interests of the child is inherent and not dependent on legislative authority, Grady, supra, 85 N.J. at 260-61, 426 A.2d 467, it may not be exercised in contravention of express public policy embodied in constitutional enactments of the Legislature. In this regard, "[a]s it relates specifically to children's issues and the rights of children, parens patriae is the philosophical source of state law, of public policy governing their general welfare, best interests, right of protection, right to be free from harm and abuse." Hoefers v. Jones, 288 N.J.Super. 590, 607, 672 A.2d 1299 (Ch.Div.1994), aff'd, 288 N.J.Super. 478, *718 672 A.2d 1177 (App.Div.1996). Courts exercise their inherent parens patriae power consistent with express legislative policy. In the context of termination of parental rights, the Court has recognized that "[a]s judges, it is our duty within constitutional bounds to effectuate the choice between these policies [preservation of the family versus the health of the child] as reflected in our legislative scheme." N.J. Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 602, 512 A.2d 438 (1986).
The issue of forced relative visitation in non-relative adoptions was addressed in In re the Adoption of Child by W.P. and M.P., 163 N.J. 158, 748 A.2d 515 (2000) (W.P.). There, the issue was whether, pursuant to the Grandparent Visitation Statute, N.J.S.A. 9:2-7.1, grandparent visitation could be enforced over the objections of non-relative adoptive parents. Id. at 160, 748 A.2d 515. To resolve the issue, the Court examined whether the Grandparent Visitation Statute was at odds with the public policy of the New Jersey Adoption Act, N.J.S.A. 9:3-37 to -56 (Adoption Act). Ibid. Finding "an inherent conflict between the two statutes[,]" id. at 163, 748 A.2d 515, the Court concluded that the overriding public policy and statutory law regarding adoptions, which "emphasizes the complete termination of the biological parent's rights, thus having the logical effect of terminating a biological grandparent's right to visitation[,]" id. at 168, 748 A.2d 515, precluded "the application of the Grandparent Visitation Statute when the child is adopted by intact, non-relative adoptive parents." Id. at 163, 748 A.2d 515.
The Court's finding was premised, in part, on the Legislature's specific rejection of the open adoption provision[4] of the Adoption Act proposed in 1993. Id. at 171, 748 A.2d 515.
As the above-cited provisions of the Adoption Act reveal, the traditional adoption process is characterized by closed and confidential proceedings. Once the adoption is final, the records are sealed, and can be opened for inspection only by court order. All legal ties of the child to its natural parents are completely and permanently severed. The child becomes the child of the adoptive parents and part of their extended family. The intent of the Legislature is to promote the creation of a new family unit without fear of interference from the natural parents.
[Id. at 169, 748 A.2d 515.]
The W.P. Court thus found that to require post-adoption visitation by grandparents in the context of non-relative adoptions would be in "direct conflict with the Legislature's rejection of open adoption. New Jersey courts have repeatedly reinforced the principle that open adoption will not be enforced absent express legislative command." Id. at 172, 748 A.2d 515.
The Court also noted that the legislative history of the Adoption Act demonstrated that "the overarching purpose of the Legislature in revising the Adoption Act was to facilitate and encourage adoptions[,]" and found that court-ordered visitation by grandparents would "discourageif not preventadoption[s]." Id. at 173-74, 748 A.2d 515. The "ultimate purpose" of the Adoption Act was to "support the newly-created family and to encourage other families to adopt a child with the knowledge that biological relatives will not interfere with the new family unit." Id. at 174, *719 748 A.2d 515. The W.P. Court adopted the position taken by DYFS that under the "legislative scheme[,]" the
State's compelling interest in protecting children in a stable and permanent home is firmly established as paramount. This strong public policy must not be undermined by the forced imposition of biological family visitation after adoption. The Grandparent Visitation Statute must not be interpreted to qualify or condition an adoption. To interpret these two statutes in any other way would lead to an unintended result and effectively undermine the intended purpose of the Adoption Act, in derogation of the rules governing statutory construction.
[Ibid.]
In closing, the Court stated: "[a]n adoptive family must be given the right to grow and develop as an autonomous family, and must not be tied to the very relationship that put the child in the position of being adopted. Any other ruling would relegate the adoptive parents to `second-class status.'" Id. at 175, 748 A.2d 515 (quoting Mimkon v. Ford 66 N.J. 426, 441, 332 A.2d 199 (1975) (Clifford, J., dissenting)).
Admittedly, as the Law Guardian argues, W.P. addressed only grandparents' rights, even though the Grandparent Visitation Statuteactually entitled "Visitation rights for grandparents or siblings" addresses both siblings and grandparents.[5] Since W.P., the Court has referred to the issue of post-adoption visitation by a birth parent as "thorny" in In re Guardianship of J.N.H., 182 N.J. 29, 31, 860 A.2d 923 (2004). And even more pertinently and recently, the Court in S.S., supra, inquired whether "the same analysis and outcome [of W.P.] would apply to a sibling." 187 N.J. at 562, 902 A.2d 215. The Court, however, never decided the issue on which it granted certificationnamely "whether [DYFS] or the courts have an affirmative duty to ensure that contact between siblings is maintained, even in a post-adoption context, when the siblings are in separate homes[,]" id. at 558, 902 A.2d 215, because both sets of adoptive parents in S.S. had been voluntarily facilitating visitation between the natural siblings and therefore no "legitimate dispute" existed. Id. at 564-66, 902 A.2d 215. The Court did note, however:
The competing public policy concerns presented by the parties and amicus curiae would benefit from legislative review. In light of the goals of the Child Placement Bill of Rights Act, the Visitation Statute, and the Adoption Act, the Legislature may wish to weigh the importance of maintaining sibling relationships in the post-adoption context against the need for protecting parental autonomy and the harmony of the new family unit, and ensuring the success of our adoption system.
[Id. at 564, 902 A.2d 215.]
In the absence of any legislative response to the Court's invitation, we are of the view that the concerns voiced in W.P. over grandparent visitation after non-relative adoption apply as well to sibling visitation post-adoption. In W.P., supra, the Court relied heavily on the Legislature's specific rejection of open adoption. 163 N.J. at 171-73, 748 A.2d 515. In fact, the *720 Legislature has repeatedly rejected attempts to move New Jersey from a closed adoption system to an open system. In a 1993 proposed amendment, the language contemplated that "post-adoption contact could continue between a child and biological family only with the voluntary consent of the adopting parent." Thus, the Legislature "never anticipated, even if the concept of open adoption had been enacted, [that visitation be compelled] against the wishes of the adoptive parents." Id. at 172, 748 A.2d 515. At the time of the deletion of the proposed amendment, the Senate Judiciary Committee advised that "[w]hile it is not the intent of the committee in deleting this language to discourage open adoptions, it was felt that the issue of open adoption represents a significant policy issue which should be addressed in separate legislation." D.M.H., supra, 135 N.J. at 494, 641 A.2d 235 (quoting Senate Judiciary Committee, Statement to Senate, No. 685 (1993)).
The Court has even refused to enforce arrangements that had initially been entered into with mutual consent that permitted continued contact between biological relatives and the adopted child, finding that such arrangements could not be "judicially enforced, given the potential for disruption of the child's family life under such arrangements and the fact that under the adoption laws the adoptive parents' rights are paramount." K.H.O., supra, 161 N.J. at 362, 736 A.2d 1246.
Another consideration in W.P. was the "overarching purpose of the Legislature" that the Adoption Act "facilitate and encourage adoptions." 163 N.J. at 173, 748 A.2d 515. The Court noted the "well-established principle that administrative agencies are entitled to substantial deference in the area of their expertise[,]" and thus gave credence to DYFS' concern that allowing biological grandparents to visit would "discourageif not preventadoption." Id. at 173-74, 748 A.2d 515. The Court placed "great reliance" on DYFS' position that post-adoption visitation would have a "chilling effect" on prospective adoptive parents. Id. at 174, 748 A.2d 515.
These same concerns over loss of parental autonomy and disruption to the new adoptive family, as well as their consequent chilling effect on adoptions, are all equally implicated in sibling visitation post-adoption. The Law Guardian offers no compelling reason why the Legislature's rejection of open adoptions is not as pertinent to the issue of sibling visitation as it is to grandparent visitation or why the same chilling effect on the State's effort to recruit adoptive parents, identified in W.P., would not be extant were sibling visitation forced upon non-relative adoptive parents. It seems to us that the heavy toll on New Jersey's "strong public policy in favor of permanency" for children in the foster care system, K.H.O., supra, 161 N.J. at 357, 736 A.2d 1246, would be the same. Indeed, this very case illustrates how the need for permanency has been negatively affected since the adoption of D.J. and N.R. has already been delayed based on their brother N.D.R.'s perceived needs. Notably, "[a] child cannot be held prisoner to the rights of others[.]" N.J. Div. of Youth and Family Servs. v. C.S., 367 N.J.Super. 76, 111, 842 A.2d 215 (App. Div.), certif. denied, 180 N.J. 456, 852 A.2d 192 (2004).
The sibling relationship is different in kind from the grandparent relationship. Yet the Legislature chose to treat them as equivalent in N.J.S.A. 9:2-7.1. Moreover, even though S.S. was decided in 2006, the Legislature has since declined the invitation to address the sibling visitation issue, evidencing no perceived need for differentiation. If the Legislature wanted to distinguish between grandparents, *721 who are denied visitation rights once the child is adopted by a non-relative according to W.P., and siblings, it could have deleted the word "siblings" from the Grandparent Visitation Statute, or enacted other legislation to expressly permit sibling visitation. See Courier Post v. Lenape Reg'l High School Dist., 360 N.J.Super. 191, 203-04, 821 A.2d 1190 (Law Div. 2002). We are convinced that the State's legislative policy is against forced sibling visitation post-adoption, and the Family Part in this case acted properly in not exercising its parens patriae power in opposition to that policy.
Even assuming a less-than-clear legislative policy, the Family Part was nevertheless correct in withholding any residual power to compel sibling visitation because of the absence in this record of clear and convincing evidence of "exceptional circumstances." The Law Guardian argues that all of the testifying experts agreed that the sibling bond here is strong and should not be broken, and that social science confirms there is a strong bond between siblings who have experienced parental loss, abuse or neglect. In our view, however, there has been no demonstration why this matter is any more compelling than the usual case in which siblings are separated due to the termination of parental rights. Even assuming the truth of the social science theory  which was not admitted into evidence at trial  the attachment between most siblings in termination cases would be equally as strong as the bonds here. It inheres in the parental termination process that the affected children are subjected to some form of neglect, abuse or abandonment and often, in the case of siblings, their experience is shared. Unfortunately, such circumstances are the norm, not "exceptional."
Moreover, the expert testimony here was not clear and convincing. While all agreed that N.D.R. enjoyed seeing his siblings and that there was a strong bond among the siblings, there was no specific evidence as to how the lack of visitation would affect N.D.R. Trott opined that N.D.R. should not be moved away from his siblings because there would be no one to "advocate" on his behalf. Aside from ignoring the fact that N.D.R.'s prospective adoptive parents might fulfill that role, Trott's opinion did not specify how N.D.R. would be harmed, nor does his report state such harm would result. Moreover, no expert considered how N.D.R.'s mental disability would factor into any harm from the denial of his sibling visitation.
The clearest testimony came from Hiscox, who opined that if the siblings were separated, there would be "some emotional harm" to N.D.R. but that it would be "short lived." Hiscox further indicated that if N.D.R. were unsuccessfully placed and had to be returned to an institution, the "risk of significant impact [would be] relatively low based on his history. He's been subjected to several disruptions in his care ... [and] been cared for by multiple caretakers. So I see the risk of harm to him as low if [the placement] were to fail."
Also lacking was any testimony on the potential impact the loss of visitation would have on the other two children, who were already placed together. No harm to them was alleged at all, and in fact, there was an "element" of unhealthy "parentification" in their relationship with N.D.R., in which they acted more in the role of parent than sibling to him. In sum, we find insufficient evidence that any harm would befall any of these children, let alone that any of them would suffer the serious psychological harm necessary to invoke the exceptional circumstances doctrine that would justify the State's intrusion on the adoptive parents' right to autonomy over their families.
*722 In light of this latter disposition, we need not reach the constitutional question raised by the Law Guardian. Moreover, the issue is not yet ripe for resolution, and we do "not reach a constitutional question unless its resolution is imperative to the disposition of litigation." Randolph Town Ctr., L.P. v. County of Morris, 186 N.J. 78, 80, 891 A.2d 1202 (2006). We note that the adoption of D.J. and N.R. has not yet been finalized, and although select home placement has been ordered for N.D.R., no adoptive parents have yet been identified for him. Moreover, according to DYFS, the prospective adoptive mother of D.J. and N.R. has expressed her willingness to have the children continue their visits with N.D.R. We discern no discrete controversy worthy of constitutional consideration, much less resolution.
Affirmed.
NOTES
[1] These termination decisions are not at issue in this appeal.
[2] A hearing was scheduled for September 9, 2009; however, the record does not disclose what occurred at that time.
[3] Federal law also mandates that in order to be eligible for federal payments, states must make reasonable efforts to place siblings removed from their home in the same foster care, kinship guardianship or adoptive placement and, if that is not possible, must provide for frequent visitation or other interaction between siblings. 42 U.S.C.A. § 671(a)(31)(A) and (B).
[4] "Open adoption" refers to "an agreement between the adoptive parents and one or more members of the child's biological family permitting visitation after the child has been formally adopted." Id. at 171-72, 748 A.2d 515 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 361, 736 A.2d 1246 (1999)).
[5] N.J.S.A. 9:2-7.1 states in pertinent part:

a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court ... for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.
[ (Emphasis supplied).]
The statute, in subsections (b) and (c), then goes on to list the factors for courts to consider in making such a determination.